**Isiah FREDERICKS et al.,**
**Plaintiffs-Appellants,**

v.

**Juanita KREPS, Secretary of the Department of Commerce, et al.,**
**Defendants-Appellees.**

**No. 78–1001.**

United States Court of Appeals,
Fifth Circuit.

April 12, 1978.

Rehearing En Banc Granted
May 17, 1978.

---

Joseph P. Hudson, Gulfport, Miss., Jack Greenberg, Legal Defense Fund, Bill Lann Lee, Eric Schnapper, New York City, for plaintiffs-appellants.

Boyce Holleman, Ben F. Galloway, III, Gulfport, Miss., for Board of Supervisors & Board of Ed.

Robert E. Hauberg, U. S. Atty., Joseph E. Brown, Jr., Asst. U. S. Atty., Jackson, Miss., John E. Kennahan, Economic Development

Admin., Office of the Chief Counsel, Washington, D. C., Robert S. Fastov, Morton Hollander, Neil H. Koslowe, Civil Div., Appellate Sec., Dept. of Justice, Washington, D. C., for Federal defendants.

Before SKELTON *, Senior Judge, and FAY and RUBIN, Circuit Judges.

FAY, Circuit Judge:

This appeal is taken from a denial by the district court of a motion for preliminary injunction sought by plaintiffs who are primarily residents and members of civic and civil rights organizations in the community of North Gulfport, Harrison County, Mississippi. The federal defendants are the Secretary of Commerce, Juanita Kreps, and two officials of the Economic Development Administration (EDA). The county defendants are the members of the Harrison County Board of Supervisors and the Harrison County Board of Education.

Plaintiffs seek a preliminary injunction to restrain the expenditure of funds provided Harrison County under the new Public Works Employment Act of 1977 for the construction of a bridge at Bell's Ferry and additional classrooms at Bel-Aire School. Plaintiffs maintain that the approval of these projects was unlawful under the Public Works Employment Act of 1977 and that the funds ($1,058,000) must be expended for the construction of a drainage project in North Gulfport.

At the hearing on the motion for preliminary injunction before the Honorable Harold Cox, plaintiffs advanced two independent grounds for holding the grants for construction of the bridge and classrooms unlawful. Plaintiffs first alleged that the applications for the bridge and school projects were filed too late to be eligible for funding under the 1977 Act. This issue was determined adversely to the plaintiffs by the district court's denial of the preliminary injunction and is presently before this Court. The second contention is that the members of the Board of Supervisors, in applying to EDA for funds, indicated a preference for the bridge project as opposed to the drainage project because of a policy of racial discrimination against the black residents of the drainage project area. This second claim is still pending in the district court and not involved in this appeal.

The Public Works Employment Act of 1976, 42 U.S.C. § 6701 et seq., was enacted on July 26, 1976, and was designed to "(1) alleviate the problem of nationwide unemployment, and (2) to stimulate the national economy by assisting State and local governments [SIC] build badly needed public facilities." [1] Congress appropriated $2 billion for expenditure under the 1976 Act which was to be distributed by EDA according to priorities and rankings established by statute, 42 U.S.C. § 6707 (1976), and regulations implemented by EDA, 13 C.F.R. § 315 (1976). As of July 6, 1977, the EDA approved 2001 project applications but was compelled to deny over 22,000 others in which requests totalled $21.8 billion.

A number of problems arose in the administration of the 1976 Act, which came to be known as "Round I," so Congress amended the Act on May 13, 1977. This new legislation authorized an additional $4 billion for "Round II" which was designed to "[extend] the program of grants to state and local governments to provide jobs through construction in places with (SIC) most distressing levels of unemployment." [2]

---

* Senior Judge of the United States Court of Claims, sitting by designation.

1. H.R.Rep.No.1077, 94th Cong., 2nd Sess. 2 (1976), reprinted in [1976] U.S.Code Cong. & Admin.News, pp. 1746, 1747.

2. S.Rep.No.38, 95th Cong., 1st Sess. 1 (1977).

The 1977 Act modified the 1976 Act in several respects. The total appropriation was largely allocated among the states according to a fixed formula, 42 U.S.C. § 6707(a), as amended, and EDA was authorized to establish "planning target" amounts to be granted to each locality. The planning target for Harrison county was set at $1.058 million. This eliminated the competition among states and localities which existed under Round I. The 1977 amendments also provided:

> the Secretary shall not consider or approve or make a grant for *any* project for which any application was not submitted for a grant under this chapter on or before December 23, 1976. (Emphasis added)

42 U.S.C. § 6707(h)(1) (1977). Three exceptions to this limitation were for projects from the Trust Territory of the Pacific Islands, from Indian tribes and Alaskan Native villages, and "from any applicant to use any allocation which may be made pursuant to regulation, to the extent necessary to expend such allocation, if a sufficient

number of applications were not submitted on or before December 23, 1976, to use such allocation." 42 U.S.C. § 6707(h)(2) (A), (B), and (C) (1977). The December 23, 1976 cut-off date implemented Congress' intention that projects submitted under Round I, which were not granted, would be the first funded in Round II.

On November 30, 1976, the Harrison County Board of Supervisors submitted a Round I application for the construction of subsurface drainage improvements in North Gulfport.[3] A total of $4,010,000 in assistance was requested for the construction of five watersheds which could be constructed as a single project. However, each watershed could be constructed separately.[4] (Plaintiff's Exhibit 17–A, p. 22). EDA did not grant any Round I funds to Harrison County projects.[5]

When Round II commenced, EDA assigned a "planning target" of $1,058,000 to Harrison County. This sum was more than $3 million short of the total amount Harrison County had sought under Round I. Pursuant to EDA's interpretation of 42 U.S.C. § 6707(h)(2)(C)[6] of the 1977 Act,

---

**3.** The parties note that a request for $207,621 to renovate the Southern Mississippi Planning and Development District Building was made to EDA at the same time. We do not doubt the truth of this statement but our search of the record did not uncover this application as part of the evidence submitted.

**4.** *Phasing Priorities—North Gulfport Subsurface Drainage*

Although definitive engineering studies have not been conducted which would establish a firm basis for adopting a program of construction phasing and funding priorities, the preliminary analyses undertaken for the purposes of this application suggest priorities for phasing that warrant consideration.

Because of a number of conditions and factors, it is suggested that construction be initiated in *Watershed # 3* which lies in the center of the North Gulfport Area. This watershed encompasses the most intensively built-up portion of the North Gulfport community and is one of the smaller drainage areas. Additionally, the preliminary cost estimate for subsurface drainage in Watershed # 3 conforms closely to the funding limits of $644,000.

Subsequent to the initial project in Watershed # 3 it is suggested that construction be phased in east and west directions from the boundaries of # 3, lying in the center of the area. In this manner, the focus of drainage

improvements would be established within subareas of North Gulfport that would derive the greatest and most immediate benefits, and which have the highest level of needs for subsurface drainage (vis-a-vis other, less built-up sections of the area).

Although the sizing and configuration of watersheds is subject to engineering criteria, some flexibility exists to permit the revision of watershed boundaries, and, therefore, construction limits and costs in each instance to fit within the funding parameters of the Economic Development Administration. Moreover, it may be possible to design the system for smaller, and, therefore, a greater number of watersheds in order to comply with budget and/or funding limitations of E.D.A.

Plaintiff's Exhibit 17–A, p. 24, entitled Local Public Works Capital Development and Investment Program Application for Construction of Subsurface Drainage Improvements. (Submitted November 30, 1976).

**5.** There is no suggestion that the drainage project or the renovation project (see note 3) did not meet the requirements of the 1976 Act. The lack of funds prompted the denial.

**6.** 42 U.S.C. § 6707(h)(2)(C) (1977).

The Secretary may receive applications for grants for projects under this chapter—

    *     *     *     *     *     *

EDA found that the subsurface drainage project request was no longer viable and declared it a nullity. Harrison County was then allowed to submit a new application.

In June, 1977, the Harrison County Board of Supervisors voted to submit a new application for project funds. The application submitted on July 11, 1977, consisted of three projects, ranked in order of the Board's priority, 42 U.S.C. § 6707(d), as follows:

(1) Bell's Ferry Bridge—a $650,000 project for the construction of a bridge over the Wolfe River which would lead to a new manufacturing plant under construction.

(2) North Gulfport—a $327,000 version of the subsurface drainage project.

(3) District Building—an $81,000 version of the renovation project for the Southern Mississippi Planning and Development District Building.

On August, 12, 1977, the Harrison County Board of Education submitted an application for a $650,000 share of the county's planning target for the construction of additional classrooms.[7] The Board of Supervisors and the Board of Education were unable to agree upon the priority to be given their respective projects.[8] EDA, therefore, exercised its authority[9] and determined that the Bell's Ferry Bridge should be ranked first and the remaining $408,000 would be given to the school board project. These funds were granted by EDA on September 30, 1977.

Plaintiffs filed this lawsuit in the district court on September 28, 1977. In their complaint plaintiffs prayed for declaratory and injunctive relief to prevent the funding of the bridge and school projects and to compel the appropriation of funds for the drainage project.

On November 14, 1977, plaintiffs moved for a preliminary injunction. A hearing on the motion was held on November 29, 1977. The district court denied the motion for preliminary injunction in a written opinion filed on December 13, 1977, and a written order entered on December 20, 1977. Plaintiffs' motion for a preliminary injunction pending appeal was also denied by the district court on January 3, 1978, and this

(c) from any applicant to use any allocation which may be made pursuant to regulation, to the extent necessary to expend such allocation, if a sufficient number of applications were not submitted on or before December 23, 1976, to use such allocation.

7. This application was submitted pursuant to the EDA's interpretation of 42 U.S.C. § 6707(b)(4) (1977), a 1977 amendment. The complete provision states:

Local government projects; energy conservation; endorsement of project by general purpose local government; projects requested by school districts

(b)(1) In making grants under this chapter, the Secretary shall give priority and preference to public works projects of local governments.

(2) In making grants for projects for construction, renovation, repair, or other improvement of buildings, the Secretary shall also give consideration as between such building projects to those projects which will result in conserving energy, including, but not limited to, projects to redesign and retrofit existing public facilities for energy conservation purposes, and projects using alternative energy systems.

(3) In making grants under this chapter, the Secretary shall also give priority and preference to any public works project requested by a State or by a special purpose unit of local government which is endorsed by a general purpose local government within such State.

(4) A project requested by a school district shall be accorded the full priority and preference to public works projects of local governments provided in paragraph (1).

8. 13 C.F.R. § 317.55(e) (1977).

(e) School districts will share in the planning targets listed in paragraph (a) of this section by jointly prioritizing their projects with the projects of those applicants whose planning targets they are sharing and by submitting a unified list of priority projects as required by § 317.37.

9. 13 C.F.R. § 317.55(f) (1977).

(f) Should the school district and the applicant whose planning target it shares fail to come to agreement with respect to prioritizing their projects, EDA will select projects according to factors which include, but are not limited to:

(i) Job creating potential;

(ii) Time necessary to complete the project;

(iii) Energy conservation;

(iv) Long term economic benefits; and

(v) Critical local needs.

Court followed suit on January 5, 1978. A motion to reconsider was denied by this Court on January 20, 1978. During the time between September 29, 1977, when the complaint was filed, and November 14, 1977, when the motion for a preliminary injunction was filed, the Board of Supervisors and the Board of Education solicited construction bids on their approved projects and announced the bids were due on December 6, 1977, and December 19, 1977, respectively. These time limits were apparently extended to shortly after the district court ruled. At this time contracts have been let and some construction has begun.

There are four prerequisites which a movant must establish to be entitled to a preliminary injunction. The four prerequisites are (1) a substantial likelihood that the movant will eventually prevail on the merits; (2) that the movant will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opponent; and (4) that the injunction would not be adverse to the public interest. *Louisiana Consumer's League, Inc. v. Louisiana State Board of Optometry Examiners,* 557 F.2d 473, 474 (5th Cir. 1977); *Morgan v. Fletcher,* 518 F.2d 236, 239 (5th Cir. 1975). The standard of review by this Court of the district court's determination is whether the district court abused its discretion in granting or denying the relief requested. *Louisiana Consumer's League, Inc. v. Louisiana State Board of Optometry Examiners,* 557 F.2d 473, 474 (5th Cir. 1977); *Ruiz v. Estelle,* 550 F.2d 238, 239 (5th Cir. 1977); *Morgan v. Fletcher,* 518 F.2d 236, 239 (5th Cir. 1975).

We find the district court abused its discretion when it denied the plaintiff's motion for preliminary injunction. We, therefore, remand to the district court for the issuance of a preliminary injunction. The preliminary injunction should prohibit expenditures on both the bridge project and the school board project pending resolution of this cause on the merits.

In the case at bar, the district court's opinion did not note which prerequisite plaintiff failed to demonstrate and upon what it based its decision. Therefore, we find it necessary to discuss each requirement to show that plaintiffs met their burden.

Demonstration of sufficient likelihood of success on the merits is the first hurdle plaintiffs overcame. Plaintiffs essentially asserted EDA exceeded the authority granted to it by the 1977 Act when it declared the county's original application for funds for the subsurface drainage project a nullity and gave priority to new applications.

The 1977 Act provided the Secretary could not consider *any* application submitted after December 23, 1976 unless the amounts requested in those applications were insufficient to use an area's entire allocation. 42 U.S.C. § 6707(h) (1977).

The legislative history of the 1977 Act makes Congress' intentions apparent. Congress intended Round II funds to be first allocated to the 22,000 applications remaining from Round I in the most expeditious manner possible. Congress' intent is evidenced by the House Report which states:

> We expect that the next round of funding will depend on the applications already filed.

H.R.Rep.No.20, 95th Cong., 1st Sess. 3, U.S. Code Cong. & Admin.News 1977, pp. 150, 152.

> The applications prepared last fall represent those projects which were ready to be implemented first. December 23, 1976 should be set as the cut-off date for applications to have been received by EDA to be considered for this next round of funding. This date would take into account those projects which were delayed in the mails and missed the original early December deadline. Any projects which were returned for deficiencies would also be considered for this round.

H.R.Rep.No.20, 95th Cong., 1st Sess. 7,[10] U.S.Code Cong. & Admin.News 1977, p. 156.

> That second round of funding will be limited as much as possible to the backlog of applications on file to avoid any long delay in preparing new applications to take advan-

---

**10.** In numerous instances Congressmen stated their understanding of the new bill. Some examples include these statements:

EDA's implementation of regulations under the 1977 Act embodies this limitation.

New applications shall be received where necessary to use a State's allocation or an applicant's planning target or an Indian tribe set-aside.

13 C.F.R. § 317.31(a) (July 11, 1977). However, in the instant case, the pending 1976 application was more than sufficient to exhaust the county's planning target. EDA's decision to deem such applications a nullity is not in keeping with the very clear intent of Congress. The more reasonable alternative would be to allow each applicant to scale down its project so that its request would be within the planning target funds and, if the nature of the project prohibited this, then that would be a compelling reason for new applications to be accepted.

> tage of this year's construction season. New applications will be received only where there are now enough applications on file to use up allocation of funds.
>
> 123 Cong.Rec.H. 3925 (daily ed. May 3, 1977) (remarks of Representative Roe, Chairman of the Subcommittee on Economic Development). That details of the public works job programs are now familiar to my colleagues so I will try to spotlight only legislation and procedural changes which may differ from the original act or its implementation. This bill provides an additional $4 billion for grants to State and local governments for the construction of public works facilities. These funds will be used to reduce the backlog of 22,000 applications still on file with the EDA. The original $2 billion which was available for this program has been expended and because there were 12 times as many applications as there were funds available, these additional funds will be directed toward reducing this backlog. Primarily applications submitted to EDA prior to December 23, 1976, will be considered for funding. In cases where an area may not have a sufficient number of applications on file to use up its allocations of funds, new applications will be accepted for all communities which will be affected by that allocation of funds. I know there are those who will be disappointed that new applications will not be accepted. However, the conferees felt that with the present number of applications on file, it would be unwise to solicit more applications. Substantially increasing applicants would turn this round of funding into a lottery system similar to the first round and would create false hopes among local officials that their projects would be funded when there really are not sufficient funds to go around.
>
> 123 Cong.Rec.H. 3927 (daily ed. May 3, 1977) (remarks of Rep. Hammerschmidt, ranking minority member of the House Committee on Public Works and Transportation).
>
> Mr. Speaker, the $4 billion authorized by this bill will be made available immediately. At present, there are some 22,000 applications totaling about $24 billion on file at the Economic Development Administration, that are 'ready to go.' The existing file of applications can be activated immediately and new applications will only be accepted in those cases where there are not enough applications on file to use up a funding allocation.
>
> 123 Cong.Rec.H. 3930 (daily ed. May 3, 1977) (remarks of Rep. Johnson, Chairman of the Conference Committee and the House Committee on Public Works and Transportation).
>
> The following is from the Senate debate on the Senate's predecessor to 42 U.S.C. § 6707(h):
>
> Title I authorizes $4 billion for the period ending September 30, 1978. It is the committee's understanding that, if the Congress appropriates the entire $4 billion in this fiscal year, the administration will obligate it within this fiscal year for projects selected from those on file with the Economic Development Administration that were submitted in late 1976. There are currently 22,000 such projects.
>
> 123 Cong.Rec.S. 3854 (daily ed. March 10, 1977) (remarks by Senator Burdick, Chairman of the Senate Conferees and of the Subcommittee on Economic Development of the Senate Committee on Environment and Public Works). Senator Burdick stated in his summary of the conference report:
>
> Only pending applications in the Economic Development Administration will be considered for this round, except new applications may be submitted by eligible applicants when a project area's benchmark or planning target exceeds the dollar value of projects now on file.
>
> 123 Cong.Rec.S. 6711 (daily ed. April 28, 1977). He added:
>
> The conference report authorizes $4 billion to be available for appropriation from time of enactment until the end of fiscal 1978, for the balance of applications already on file with the Economic Development Administration as a result of the 1976 act, and new projects necessary to use allocation of these funds.
>
> \*   \*   \*   \*   \*   \*
>
> In summary, Mr. President, I believe the Public Works Employment Act of 1977:
>
> \*   \*   \*   \*   \*   \*
>
> Limits the second round to the $22 billion backlog of applications to assure speedy implementation in order to take advantage of this year's construction season, with new applications received where necessary to use all the allocated funds.
>
> 123 Cong.Rec.S. 6712 (daily ed. April 28, 1977).

The question of the priority of the Board of Education's project has been raised. We agree with EDA's statement that Congress intended that the localities determine the priority to be given the projects submitted. However, the wording of the statute makes it clear the localities must make that determination with respect to projects submitted under Round I on or before December 23, 1976.

A reading of 42 U.S.C. § 6707(b) might lead one to think that projects submitted by school districts under the 1977 Act would be considered on a par with projects of local governments submitted by December 23, 1976. However, a review of the legislative history of the 1976 Act makes Congress' intent clear in this area.

When the 1976 Act was passed, the statute defined "'local government' [to mean] any city, county, town, parish, or other political subdivision of a State, and Indian tribe." 42 U.S.C. § 6701(3) (1976). The House Report of the 1976 Act states:

> For the purpose of this Act, it is intended that special districts such as school districts and regional authorities formed by local governments that are established or authorized by State law will be considered a political subdivision of the State.

H.R.Rep.No.1077, 94th Cong., 2d Sess. 3 reprinted in [1976] U.S.Code Cong. & Admin. News, pp. 1746, 1748. The 1977 Act did not change this definition. What becomes clear is that the priority afforded school districts' projects under 42 U.S.C. § 6707(b)(4) (1977) is limited to school district applications filed on or before December 23, 1976.

In summary, we think the plaintiff's prospects of prevailing in their attack upon EDA's regulations and procedures are excellent.

The second requirement for the granting of a preliminary injunction is that movant will suffer irreparable injury unless the injunction issues. From the time the motion for preliminary injunction was filed until now, the funds expended for the bridge and the school projects have depleted the total to which plaintiffs believe the drainage project is entitled. This depletion is causing plaintiffs irreparable injury because once the amount allocated is spent, there is no source of funds from which these alleged illegal expenditures could be replaced.

A balancing of the scales between the possible injury to plaintiffs as opposed to the damage to defendants leans heavily in favor of the plaintiffs. The brief delay which would be caused by the issuance of a preliminary injunction until a decision on the merits could be made does not outweigh that which the plaintiffs stand to lose.

The last prerequisite is that the injunction would not be adverse to the public interest. Again, the delay of construction, which could be halted altogether if plaintiffs succeed, until a decision on the merits is made is not so adverse to the public interest to require the denial of the preliminary injunction.

On the basis of the foregoing, we remand to the district court for the immediate entry of a preliminary injunction halting any and all expenditure of funds granted by EDA on both the Bell's Ferry Bridge project and the Bel-Aire School project until the district court holds a hearing and makes a decision on the merits.

Reversed and remanded with instructions.

### On Rehearing En Banc

Before BROWN, Chief Judge, and THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, MORGAN, CLARK, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN, and VANCE, Circuit Judges.

BY THE COURT:

A member of the Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc,

IT IS ORDERED that the cause shall be reheard by the Court en banc on briefs without oral argument.