Isiah FREDERICKS et al.,
Plaintiffs-Appellants,

v.

Juanita KREPS, Secretary of the Department of Commerce, et al.,
Defendants-Appellees.

No. 78–1001.

United States Court of Appeals,
Fifth Circuit.

Aug. 2, 1978.

---

Joseph P. Hudson, Gulfport, Miss., Jack Greenberg, Bill Lann Lee, Eric Schnapper, Legal Defense Fund, New York City, for plaintiffs-appellants.

J. Boyce Holleman, Ben F. Galloway, Gulfport, Miss., for Board of Supervisors and Board of Ed.

Robert E. Hauberg, U. S. Atty., Joseph E. Brown, Asst. U. S. Atty., Jackson, Miss., John E. Kennahan, Robert S. Fastov, Economic Development Administration, Morton Hollander, Neil H. Koslowe, Civil Div., Appellate Section, Dept. of Justice, Washington, D. C., for federal defendants-appellees.

W. Joel Blass, Gulfport, Miss., for amicus curiae L & A Contracting Co.

Before BROWN, Chief Judge, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, MORGAN, CLARK, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN and VANCE, Circuit Judges.

CHARLES CLARK, Circuit Judge:

This action for declaratory and injunctive relief was brought by individual residents and civic and civil rights organizations of North Gulfport, Harrison County, Mississippi, in an effort to divert a federal grant of $1,058,000 under the Local Public Works Capital Development and Investment Act of 1976, *as amended by* Public Works Employment Act of 1977, 42 U.S.C.A. § 6701 *et seq.* (1977 & Cum.Supp.1978), from two public works projects selected by county and school board officials to a different project in the plaintiffs' neighborhood. After the district court denied the plaintiffs' motion for a preliminary injunction and after the district court and a panel of this court denied the plaintiffs' motions for an injunction pending appeal, work was begun on the two projects selected by county and school board officials. Following oral argument, another panel of this court reversed the district court and directed the entry of an injunction halting the ongoing construction. *Fredericks v. Kreps,* 571 F.2d 1316 (5th Cir. 1978). The court en banc agreed to rehear the case on briefs without oral argument, *Fredericks v. Kreps,* 571 F.2d 1316 (5th Cir. 1978), and on June 8, 1978, the court en banc recalled the panel's mandate and directed the district court to vacate the injunction issued pursuant to that mandate. In today's opinion we give the reasons for our recall action.

The purposes of the Local Public Works Capital Development and Investment Act of 1976, Pub.L. No. 94–369, 90 Stat. 999 (1976 Act), were twofold: "(1) to alleviate the problem of national unemployment, and (2) to stimulate the national economy by assisting State and local governments build badly needed public facilities." H.R.Rep. No. 1077, 94th Cong., 2d Sess. 2, *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 1746, 1747. Congress sought to accomplish these purposes by allowing state and local governments to apply for federal grants to build public works projects selected by the applicant and approved by the Economic Development Administration of the Department of Commerce (EDA), the administering agency.[1] Congress initially appropriated $2 billion to fund this program (this initial funding phase later came to be known as Round I), and in order to guarantee the expeditious disbursement of these funds Congress imposed an unusually strin-

1. EDA was given the authority to prescribe "those rules, regulations, and procedures (including application forms) necessary to carry out this chapter." 42 U.S.C.A. § 6706 (1977).

gent timetable on EDA.[2] Priorities for grants were established both by statute, 42 U.S.C.A. § 6707 (1977), and by EDA-promulgated regulations, 13 C.F.R. § 316.7 (1977). As of July 6, 1977, EDA had been able to approve 2001 applications for grants, but it had been compelled to deny over 22,000 others seeking a total of $21.8 billion.

Due to the exhaustion of funds and problems in the administration of the 1976 Act, Congress enacted the Public Works Employment Act of 1977, Pub.L.No. 95–28, 91 Stat. 116 (1977 Act). This legislation authorized an additional $4 billion to continue the program (Round II), and it made several changes in the operation of the program in an attempt to do a better job of (i) insuring a more equitable distribution of projects, (ii) simplifying administration by making program regulations more easily understood, (iii) reflecting local priorities, and (iv) eliminating "gerrymandering" of project areas so that program investments are oriented more toward the areas of greatest distress. H.R.Rep. No. 20, 95th Cong., 1st Sess. 3, *reprinted in* [1977] U.S.Code Cong. & Admin.News, pp. 150, 152. To achieve a fairer distribution of project funds, Congress allocated appropriations among the states largely according to a fixed formula, 42 U.S.C.A. § 6707(a) (Cum.Supp.1978), thus eliminating the competition among states and localities that had existed in Round I. EDA implemented this objective by assigning "planning targets" to state and local government units, which represented the maximum amount of Round I and Round II funds each unit was eligible to receive. The formula used by EDA to compute these planning targets is not controverted in this case.

The 1977 Act retained the stringent timetables imposed by EDA to guarantee the expeditious hiring of unemployed workers. Consistent with its policy of expedition, Congress decided that to avoid any long delay in preparing new applications, the funding provided in Round II should be used as much as possible to reduce the backlog of the 22,000 applications on file with the EDA. *See* the legislative history quoted in *Fredericks v. Kreps,* 571 F.2d 1316, 1320–21 n. 10 (5th Cir. 1978). The statutory provision reflecting this intent is 42 U.S.C.A. § 6707(h) (Cum.Supp.1978):

(1) Except as provided in paragraph (2) of this subsection, the Secretary shall not consider or approve or make a grant for any project for which any application was not submitted for a grant under this chapter on or before December 23, 1976.

(2) The Secretary may receive applications for grants for projects under this chapter—

(A) from the Trust Territory of the Pacific Islands;

(B) from Indian tribes and Alaska Native villages;

(C) from any applicant to use any allocation which may be made pursuant to regulation, to the extent necessary to expend such allocation, if a sufficient number of applications were not submitted on or before December 23, 1976, to use such allocation.

EDA's interpretation of section (2)(C) is the gravamen of this lawsuit.

The Harrison County Board of Supervisors submitted a Round I application on November 30, 1976, for $4,010,000 to construct a subsurface drainage system in North Gulfport.[3] This project was to consist of five watersheds which were to be integrated into a single system. EDA was

---

2. Congress directed EDA to promulgate implementing regulations within 30 days of the effective date of the Act. 42 U.S.C.A. § 6706 (1977). Congress further required EDA to dispose of applications for funds within 60 days of their receipt, and provided that the failure to act within that deadline would be deemed approval of the grant requested. Id. Finally, EDA was required to make certain that construction of

funded projects could begin within 90 days of project approval. 42 U.S.C.A. § 6705(d) (1977). These provisions were retained in the 1977 Act.

3. A request for $207,621 to renovate the Southern Mississippi Planning and Development District Building was also made to EDA at this time. This application does not appear in the record, and it is not an issue in this case.

unable to grant Round I funds for this project and denied the application. When Round II commenced, EDA assigned Harrison County a planning target of $1,058,000, almost $3,000,000 less than the amount sought in Harrison County's Round I drainage project application.

Congress did not explicitly provide a procedure for dealing with applications submitted before December 23, 1976, which sought more funds than the applicant was eligible to receive. Regulations governing this contingency were promulgated by EDA. In pertinent part the regulations declared projects whose costs exceeded the planning target to be ineligible unless the applicant funded the excess. 13 C.F.R. § 317.15(e), 42 Fed.Reg. 27,434, *as amended by* 42 Fed.Reg. 35,823 (1977). In accompanying guidelines, EDA allowed five options to an applicant whose pending project did not fit within its planning target:

a. find other sources to provide funding for the amount of the project that exceeds the planning target;

b. reduce the scope of the project;

c. substitute a smaller project;

d. use its funds to endorse the project of another applicant, such as the county government, or jointly endorse a regional project along with other applicants; or

e. not spend its planning target. (In this case, EDA will administratively reallocate the funds elsewhere in the State).

Economic Development Administration, U.S. Dep't of Commerce, Guidelines for Round II of the Local Public Works Program ¶ V.B.3. (June 6, 1977). These regulations and guidelines were approved by congressional oversight committees before they became effective. *See* H.R.Rep. No. 20, 95th Cong., 1st Sess. 4, *reprinted in* [1977] U.S.Code Cong. & Admin.News, pp. 150, 153 (discussing the plans for committee review);

*Oversight of Proposed Rules and Regulations of the Public Works Employment Act of 1977: Hearings Before the Subcomm. on Regional and Community Development of the Senate Comm. on Environment and Public Works,* 95th Cong., 1st Sess. (May 17, 1977) (*Senate Oversight*); *Implementation of the Local Public Works Capital Development and Investment Act: Joint Hearings Before the Subcommittee on Investigations and Review of the House Committee on Public Works and Transportation,* 95th Cong., 1st Sess. (May 19, 1977) (*House Oversight*).[4]

The Harrison County Board of Supervisors did not choose to fund the excess costs of its Round I project. EDA therefore declared its original application a nullity, and the Board of Supervisors, pursuant to the guidelines, submitted a new application on July 11, 1977, seeking funds for the following three projects, in order of priority:

1. Bells's Ferry Bridge—a $650,000 project for the construction of a bridge over the Wolfe River which would lead to a new manufacturing plant under construction.

2. North Gulfport—a $327,000 version of the subsurface drainage project.

3. District Building—an $81,000 version of the renovation project for the Southern Mississippi Planning and Development District Building.

On August 12, 1977, the Harrison County Board of Education entered the picture and applied for a $650,000 share of Harrison County's planning target for the construction of additional classrooms at an overcrowded school. This application sought to take advantage of a priority provision for school districts added by the 1977 Act, which is discussed below.

After rating Harrison County's projects according to the criteria in its regulations, EDA ranked the Bell's Ferry Bridge Project first and approved for it a grant of

---

4. EDA specifically presented to these committees its plan for handling Round I applications exceeding the area's planning target with the explanation that "[w]hat we are attempting is to maximize to the extent possible the decision-making role of local elected officials and to reduce the project selection role of EDA and the Federal Government." *Senate Oversight* at 9; *see House Oversight* at 78.

$650,000, and EDA ranked the School Board project second and approved for it a grant of $408,000, the remainder of Harrison County's planning target. Since these two grants exhausted the Round II funds available to Harrison County, EDA was unable to grant any funds for the North Gulfport drainage project or for the renovation of the district building.

On September 28, 1977, the plaintiffs brought this action seeking declaratory and injunctive relief to prevent the funding of the bridge and school projects and to compel the appropriation of all Round II planning target funds for partial construction of the subsurface drainage system for North Gulfport. The plaintiffs alleged that the approval of the bridge and school projects was unlawful in several respects, among them that the applications for the bridge and school projects were filed too late under 42 U.S.C.A. § 6707(h) (Cum. Supp.1978) to be eligible for funding. At the hearing held November 29, 1977, on plaintiffs' motion for preliminary injunction, plaintiffs asserted that the bridge and school project applications were not timely since they were not filed with EDA before December 23, 1976, and that EDA should be compelled to fund a scaled-down version of the North Gulfport drainage project since the application for that project was on file before December 23, 1976, and since the application was more than sufficient to exhaust Harrison County's planning target.[5]

The district judge denied the requested preliminary injunction on December 19, 1977, and on December 29 he denied an injunction pending appeal. A panel of this court denied plaintiffs' motion for an injunction pending appeal on January 5, 1978, but invited the plaintiffs to file a motion to reconsider its action, which the plaintiffs

did. The same panel later denied the motion to reconsider on January 20, 1978, and immediately thereafter the government released the grant funds so that construction on the projects could commence.[6]

▮ After oral argument, another panel of this court on April 12 reversed the district court and directed the immediate entry of a preliminary injunction to halt construction on the two projects. *Fredericks v. Kreps*, 571 F.2d 1316 (5th Cir. 1978). The panel opinion noted that the North Gulfport drainage project consisted of five watersheds, and determined that "each watershed could be constructed separately." *Id.* at 1318. The panel noted that "Congress intended Round II funds to be first allocated to the 22,000 applications remaining from Round I in the most expeditious manner possible," *id.* at 1320, and held that

EDA's decision to deem [applications for amounts in excess of an applicant's planning target] a nullity is not in keeping with the very clear intent of Congress. The more reasonable alternative would be to allow each applicant to scale down its project so that its request would be within the planning target funds and, if the nature of the project prohibited this, then that would be a compelling reason for new applications to be accepted.

*Id.* at 1321–22. The panel also held that "the priority afforded school districts' projects under 42 U.S.C. § 6707(b)(4) (1977) is limited to school district applications filed on or before December 23, 1976." *Id.* at 1322. The mandate to grant preliminary injunctive relief was ordered to issue immediately. By holding that the drainage project was severable, that EDA was bound to sever it and fund the portions within the

---

5. The plaintiffs also argued to the district court that the members of the Harrison County Board of Supervisors had indicated a preference for the bridge instead of the drainage project because of a policy of racial discrimination against the black residents of the area affected by the drainage project. The district court found insufficient evidence of racial discrimination to warrant preliminary relief, and this issue is not involved in this appeal.

6. Both parties recognized that the ruling on plaintiffs' motion for an injunction pending appeal would be crucial. Therefore, they entered into a stipulation under which EDA agreed to withhold the funds for the two projects until the court ruled on the motion.

Judge Goldberg, who did not participate in the first decision, did participate in the reconsideration.

planning target funds allotted to Harrison County, and that the school district's priority application was filed too late, the panel effectively decided the merits of the controversy. Finding this decision incorrect, we reversed and recalled the mandate.

The dispositive issue in this appeal is whether EDA's regulation and guideline scheme for dealing with Round I applications which exceed an area's Round II planning target constitutes a reasonable interpretation of the 1977 Act. Because Congress made no provision for the widespread situation in which the amount required to fund a Round I application exceeded the planning target assigned to an area, EDA, under its mandate from Congress to implement the Act, promulgated 13 C.F.R. § 317.-15(e), 42 Fed.Reg. 27,434, *as amended by* 42 Fed.Reg. 35,823 (1977), declaring applications for projects costing more than the applicant's planning target ineligible for Round II funding. Under the same authority it established Guidelines for Round II of the Local Public Works Program ¶ V.B.3. (June 6, 1977), giving such applicants options which included the submission of new applications for different projects. These provisions, as applied in this case, are a valid interpretation of Congress' intent.

When a statute empowers an agency to prescribe rules and regulations necessary to carry out the provisions of the act, a reviewing court must sustain regulations promulgated thereunder so long as they are "reasonably related to the purposes of the enabling legislation." *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 369, 93 S.Ct. 1652, 1661, 36 L.Ed.2d 318 (1973). In making this determination, the reviewing court must give great deference to the interpretation given the statute by the agency charged with its administration. This principle of statutory construction was explained by the Supreme Court in *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), thus:

> When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged

with its administration. To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings. Particularly is this respect due when the administrative practice at stake involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new.

*Id.* at 16, 85 S.Ct. at 801 (citations omitted); *see Trans Alaska Pipeline Rate Cases*, —— U.S. ——, ——, n. 26, 98 S.Ct. 2053, 56 L.Ed.2d 591 (1978).

This case is one in which deference is especially warranted. The administrative practice at stake here involves the contemporaneous construction of the statute by the agency charged with executing the legislation which acted under a stringent congressional timetable with the express approval of its construction by congressional oversight committees. EDA asserts that the procedures applied to Harrison County's applications have been followed in 2100 cases throughout the country involving grants totalling $772,407,000, and that the procedures applied to the school board application have been followed in 340 cases involving grants totalling $8,818,499. Unless EDA's interpretation of 42 U.S.C.A. § 6707(h) (Cum.Supp.1978) is clearly wrong or unreasonable, the court should not substitute its judgment of how to administer the program for that of the agency. *See Trans Alaska Pipeline Rate Cases*, —— U.S. ——, ——, n. 26, 98 S.Ct. 2053, 56 L.Ed.2d 591 (1978); *Florida v. Mathews*, 526 F.2d 319, 323 n. 10 (5th Cir. 1976).

In ordering the immediate cessation of work in Harrison County under the 1977 Act, the panel determined that § 6707(h), quoted above, required a "more reasonable" procedure than that used by EDA to deal with applications filed under Round I which exceeded Round II planning targets funds.

We disagree with the panel's construction of § 6707(h) and its substitution of its judgment for that entrusted to the agency by Congress.

The paramount purpose of the Act was to achieve the promptest possible reduction in national unemployment through a federally funded program of public works. The reason Congress provided that Round I applications be used where possible was to permit Round II funds to be translated into jobs without the delays incident to a new round of studies and submissions, thus carrying out the statutory imperative of prompt action. Section 6707(h) was not an effort to declare previously filed projects more worthwhile than those that might be later submitted and should not be read as expressing any intent that only certain projects be built.

The dominant statutory purpose controls our assessment of the agency's implementing regulations and guidelines. Since the total cost of December 23, 1976 applications exceeded the funds appropriated under Round II by more than five times, it is obvious that only a part of the projects then on file could go forward. Thus the congressional directive to use those applications where possible required EDA to develop some method for dealing with filed projects which exceeded the area planning target, which obviously could not be approved as filed. If EDA undertook to evaluate each over-budget application throughout the nation to determine if it could be reduced in scope or cost and still be worthwhile, the agency had to decide whether (1) to delay processing while it created a staff of sufficient size to handle such assignments with dispatch; (2) to bog the program down with backlogs while an inadequate staff struggled to make a massive number of reassessments; (3) to arbitrarily cut excessive projects to planning target size with the result that they might become useless monuments to bureaucratic waste. The alternative to processing within the agency was

to spread the decisions on reduction or substitution to the local governmental units from which over-budget applications had come. The EDA chose the latter course. It implemented its choice by rejecting all over-budget projects and giving options to the submitting authority to find excess funding elsewhere, scale down, substitute, or abandon.

The panel disagreed with this agency action. It held the EDA should have retained the decision whether each over-budget project could be cut to size. Unless EDA decided it was unfeasible to reduce a project, it was to direct the local government agency to make the reduction. The panel construed § 6707(h) to give the highest priority to projects filed by December 23, 1976. If Harrison County's application was the only one before EDA requiring analysis and if it can be viewed as five readily separable projects of less than budget size, this appears to be an acceptable construction. Considering, however, that EDA's regulations and guidelines apply nationwide and that decisions on separability or partial funding may be quite complex, it can be seen that the panel's approach runs afoul of the Act's overall intent to put people to work as soon as possible.

EDA chose a different and, in our view, equally reasonable route. It declared a nullity any application which required funding in excess of an area's planning target and left to each local government the task of deciding to resubmit the project with excess funding provided from other sources, to scale down the project, to substitute other projects, or to abandon the planning target funds. By tabulating applications and planning targets, EDA could quickly make its decision on whether a project was over the target and each local authority whose project exceeded its share could go forward with assessing its own position simultaneously. In this way the dominant theme of expedited action is best served.[7]

---

7. We also note that EDA's route best serves the subsidiary theme of leaving to local elected officials the task of selecting projects reflecting local priorities.

■ Even assuming *arguendo* that the panel's choice of procedure is more reasonable than that selected by the agency and approved by congressional committees, the EDA regulations and guidelines must still control unless we determine that they are unreasonable and conflict with the Act. If the interpretation given a statute by the agency charged with its administration is reasonable, a court must sustain the agency's actions even though the court might consider an alternative approach to be more reasonable. *Udall v. Tallman*, 380 U.S. at 16, 85 S.Ct. at 801. Since we find EDA's regulations and guidelines are a reasonable means of executing their legislative charge and do not conflict with the Act, we must approve them.

■ Our determination that EDA's regulations are consistent with the intent of Congress is reinforced by the fact that congressional oversight committees acquiesced in EDA's regulations and guidelines before they were put into effect. Hearings were held in May 1977, and the regulations and guidelines were allowed to become operative. That the careful review of these committees found the regulations and guidelines to be consistent with the congressional intent lends the firmest possible support to our conclusion.

■ The priority given school board projects in the 1977 Act presents a separate problem. The 1976 Act directed the Secretary, in making grants, to "give priority and preference to public works projects of local governments." 42 U.S.C.A. § 6707(b) (1977). The 1977 Act retained the above priority as 42 U.S.C.A. § 6707(b)(1) (Cum.Supp.1978), and added the following as 42 U.S.C.A. § 6707(b)(4) (Cum.Supp.1978): "A project requested by a school district shall be accorded the full priority and preference to public works projects of local governments provided in paragraph (1)." The Harrison County Board of Supervisors and the Board of Education were unable to agree on a unified priority list for their respective projects, *see* 13 C.F.R. § 317.-55(e), 42 Fed.Reg. 35,824 (1977), so EDA exercised the authority provided by its regulations to set priorities in the absence of local agreement. *See* 13 C.F.R. § 317.55(f), 42 Fed.Reg. 35;824 (1977). These regulations regarding school district applications were also approved in their original form, 13 C.F.R. § 317.53(d), 42 Fed.Reg. 27,438 (1977), by congressional oversight committees.

In view of our holding that EDA was authorized to declare Harrison County's oversize 1976 project a nullity, we are not called upon to decide whether EDA can fund a project applied for by a school district after December 23, 1976, when the local government whose planning target the school district is attempting to share has pending Round I applications sufficient to exhaust its planning target. Rather, the question before us is whether, when a local government is entitled to submit an application after December 23, 1976, under the exception allowed by 42 U.S.C.A. § 6707(h)(2)(C) (Cum.Supp.1978), a *school district* eligible to share the local government's planning target may also file an application for a project after December 23, 1976, on a basis of equal priority with the local government under 42 U.S.C.A. § 6707(b)(4) (Cum.Supp.1978).

We uphold EDA's determination that the Harrison County Board of Education's project application was entitled to consideration and equal priority with the Board of Supervisors' project application. 42 U.S.C.A. § 6707(b)(4) (Cum.Supp.1978) expresses Congress' intent that school district applications be accorded "full priority and preference" to those submitted by general purpose local governments. Since the general purpose local government is allowed by statute and regulations to submit applications after December 23, 1976, it is certainly reasonable to conclude that Congress intended that school districts eligible to share

the local government's planning target have at least an equal right. EDA's acceptance and consideration of the School Board's application and its resolution of the project priorities pursuant to its regulations when the School Board and Board of Supervisors were unable to agree were valid exercises of its regulatory authority.[8]

For these reasons, EDA's funding of the Bell's Ferry Bridge project and the School Board project, in lieu of funding some limited part of the North Gulfport drainage system project, was not only consistent with the statutory scheme, but also was proper under the agency's congressionally approved regulations and guidelines. The panel opinion is vacated, and the district court's denial of the preliminary injunction is

AFFIRMED.

BROWN, Chief Judge, THORNBERRY, COLEMAN, AINSWORTH, MORGAN, RONEY, TJOFLAT, HILL and VANCE, Circuit Judges, concurring.

FAY, Circuit Judge, with whom GOLDBERG, GODBOLD, GEE and RUBIN, Circuit Judges, join, dissenting:

For the reasons set forth in the panel opinion found at 571 F.2d 1316 (5th Cir. 1978), I respectfully dissent. Few pieces of legislation have a clearer legislative history. Courts are quick to criticize when Congress does not spell out in clear precise language the "legislative intent." It seems to me we have an equal obligation to enforce such when Congress expends the necessary effort to lay out the yardstick.

Traveling under the flag of—

"The paramount purpose of the Act was to achieve the promptest possible reduction in national unemployment through a federally funded program of public works."—

the en banc court is saying in essence so long as you spend the money rapidly we will approve. The justification for this approach is that it would be exceedingly difficult for EDA to review timely filed applications for severability. Little wonder we have government by bureaucracy! Congress shared no such concern and more importantly did not delegate authority to the EDA sufficient to obviate such responsibility.

The en banc court acknowledges that the center of this controversy is paragraph (2)(C) of 42 U.S.C.A § 6707(h). This short statement could not be clearer. If a sufficient number of applications were not submitted on or before December 23, 1976, to use such allocation, the applicant may submit new applications to the Secretary. The Harrison County Board of Supervisors submitted a timely Round I application for a $4,010,000 subsurface drainage system. This project was not only severable, but as filed was designed to be built in five different independent sections. To conclude that such a project would not use, or expend, a total allocation of $1,058,000 is a game of semantics beyond my intellectual agility.

---

8. We are not presented with a contest between the Board of Supervisors and School District authorities as to their relative priorities vis-a-vis each other.