The COCA–COLA COMPANY, Plaintiff-Appellant,

v.

The ATCHISON, TOPEKA, AND SANTA FE RAILWAY COMPANY, et al., Defendants-Appellees.

No. 77–1610.

United States Court of Appeals, Fifth Circuit.

Dec. 14, 1979.

Joe G. Fender, Houston, Tex., for plaintiff-appellant.

James L. Ware, Galveston, Tex., for Atchison, Etc.

Alan J. Thiemann, Atty., I.C.C., Jerome Nelson, Washington, D.C., James R. Gough, Asst. U.S. Atty., Houston, Tex., for U.S.A. and I.C.C.

Before SIMPSON, TJOFLAT and HILL, Circuit Judges.

SIMPSON, Circuit Judge:

The Coca-Cola Company filed three substantially identical complaints in the district court against three different railroads[1] on August 27, 1973, seeking refunds for freight charges paid on import shipments of coffee. The complaints asserted overcharges in violation of railroad tariffs. The district court, applying the doctrine of primary jurisdiction,[2] referred one action[3] to the Interstate Commerce Commission (ICC) for preliminary determination. The three cases were consolidated and stayed pending ICC decision. The ICC referred the matter to an administrative law judge (ALJ) who found that the railroads had properly applied the tariff. App. at 118–20. Coca-Cola filed exceptions to the initial decision of the ALJ with the ICC. The ICC agreed with the findings of the ALJ and dismissed Coca-Cola's complaint. App. at 137–38. Coca-Cola, by a fourth suit naming the ICC and the United States as defendants, sought reversal of the ICC order.[4] The district court ordered the four cases consolidated on February 3, 1976. The district court ruled that the ICC (and the ALJ) had correctly interpreted the applicable tariff and hence that Coca-Cola was not entitled to refund on any of the freight charges paid to the railroads. App. at 257–61. The district court order is before us for review on Coca-Cola's appeal. We determine that while the district court selected an incorrect standard of review of the ICC decision, its final conclusion, that the ICC had properly construed the applicable tariff, is correct. We therefore affirm.

The disputed freight charges concern shipments of green coffee imported by

---

1. *Coca-Cola Co. v. Atchison, T. & S. F. Ry.*, no. 73–H–1203 (S.D.Tex. filed Aug. 27, 1973); *Coca-Cola Co. v. Chicago, R. I. & Pac. R.R.*, no. 73–H–1204 (S.D.Tex. filed Aug. 27, 1973); *Missouri-Kan.-Tex. R.R.*, no. 73–H–1205 (S.D.Tex. filed Aug. 27, 1973).

2. Under the doctrine of primary jurisdiction courts defer action pending appropriate administrative agency's ruling. *See generally*, 5 B. Mezines, J. Stein & J. Gruff, Administrative Law §§ 47.01–03 (1979).

3. *Coca-Cola Co. v. Missouri-Kan.-Tex.Ry.*, supra.

4. *Coca-Cola Co. v. United States*, no. 75–H–1039 (S.D.Tex. filed June 19, 1975). In reparation actions the district court has jurisdiction to initially review decisions of the ICC. 28 U.S.C. § 1336(a) (1979).

Coca-Cola through the Port of Houston and shipped on appellees' railroads to Omaha, Nebraska. The charges for this movement are set forth in Items 6234 and 9644–C of the governing tariff.[5] Items 6234 and 9644–C list in tabular form the applicable rate expressed in cents per hundred pounds for various minimum weights. The rates are subject to a reference consisting of the circled number "17" (circle reference 17). The meaning of circle reference 17 is explained in the tariff:

> Applicable on import traffic only. A charge of 12 cents per 100 pounds must be assessed in addition to rates subject to this reference mark. This charge accrues to the line-haul port railroad which performs the port terminal service or bears the expense of such service.

SWL Tariff 108–U, I.C.C. 4654, *quoted in* App. at 55.

The charge is referred to as a "waterborne charge" and is imposed on certain import shipments because carriers provide more facilities and services for import shipments than for domestic shipments.[6] All parties agree that Coca-Cola's shipments were subject to the Item 6234 and Item 9644–C rates and the waterborne charge imposed by circle reference 17. The disagreement concerns Item 317–H of the tariff. SWL Tariff 108–U, I.C.C. 4654.

Item 317–H provides that as a part of the "from shipside rate" the carrier railroad absorbs wharfage charges up to a stated maximum.[7] Amounts in excess of the stated maximum absorption are chargeable to the shipper, Coca-Cola in the instant case. The maximum absorption rates were adopted because although wharfage charges were historically included as a part of the "from shipside" rate, the services are actually performed by port operators over whom nei-

ther the railroads nor the ICC has control. Sharply escalating port terminal expenses threw the brunt of these charges on the railroads. The railroads responded by publishing maximum absorption rates in order to control the economics of the increased port operator charges. According to railroad witness Donald S. Benyon, the railroads reduced their rates by the amount of the unabsorbed wharfage expense at the time the maximum absorption tariffs were published. App. at 105. Coca-Cola has not presented evidence to the contrary.

Coca-Cola argues that exception 1 to Item 317–H excepts it from the maximum absorption provision. Exception 1 provides:

> Rates published in this tariff, which in addition to the line-haul rates also provide stated amounts for port terminal services or for loading or unloading, are not subject to the provisions of this item.

Item 317–H SWL Tariff 108–U, I.C.C. 4654.

Coca-Cola contends that the waterborne charge imposed by circle reference 17 is a rate "published . . . in addition to the line haul rates" and that the waterborne charge provides "stated amounts for port terminal services." Therefore, argues Coca-Cola, they are not subject to the maximum absorption tariff.

But the ALJ found against Coca-Cola:

> The question for determination is whether the waterborne charge is a stated amount for port terminal services or for loading in addition to the line-haul rate within the meaning of the exception to the application of the loading charge less the charge which is to be absorbed. Exceptions provisions must be strictly construed. The exception here provides that the rates (1) must be in addition to the line-haul rates and (2) must be for port terminal services or for loading.

---

5. SWL Tariff 108–U, I.C.C. 4654. The date of each shipment determined whether Item 6234 or Item 9644–C applied.

6. *Ex Parte 212, Increased Freight Rates*, 304 I.C.C. 289, 352–56 (1956) (the initial ICC authorization of the waterborne charge). Some of the extras are: "loading, unloading, bracing, blocking of freight, gathering of empty cars for inbound freight; holding, switching, and trans-

ferring of loaded cars containing outbound freight; and extra clerical work for all waterborne freight at all ports in varying degrees." *Id.* at 352.

7. The charges and the maximum amounts to be absorbed by the railroads are set forth in TLFB 21–G and H, I.C.C. 1105.

The complainant's position is grounded upon two assumptions, both of which are wrong. It assumes (1) that the waterborne charge is in addition to the line-haul rate and (2) that the waterborne charge is for port services because it accrues to the carrier performing the port terminal services. The waterborne charge is not an addition to the line-haul rate, but is one of two parts of the line-haul rate and accrues to the carrier performing the port terminal services, whereas the other part accrues to all the carriers in the movement, including the port terminal carrier. It is not identified as applying for any port terminal service.

The ICC agreed with the findings of the ALJ and further held that Exception 1 applies only to "two factor" rates of the type described in *Cancellation of Wharfage Absorption*, 335 I.C.C. 477, 482–83 (1969). App. at 137–38. Two factor rates are rates which state one charge for the line haul service (movement from point a to point b) and another charge for *all* port terminal services. The maximum absorption provisions obviously do not apply to two factor rates because all port terminal charges are billed to the shipper.[8] Indeed, application of the maximum absorption tariff to two factor rates would result in a double charge for the same service. There is no double charge involved in the instant case; there was uncontradicted evidence that the railroads reduced their tariffs by the amount of the unabsorbed charges at the time the maximum absorption provisions were adopted.

The district court refused to set aside the ICC's order and held that: the ICC's order

---

8. Railroad witness J. J. Dolan explained the possible classes of rates as follows:

The rates were published as either (1) shipside rates (included in this type are partial shipside rates i. e., rates which include loading of the rail car but did not include wharfage charges, or vice versa, or rates where the absorption of loading and/or wharfages charges were limited); (2) so-called two-factor rates; and (3) non-shipside rates.

I

The shipside rate published by railroads referred to in (1) above originally included all the costs for loading service and for wharfage, and were not subject to any added charges to cover terminal expenses. Under ExParte 212 and 223, however, such rates were made subject to an added waterborne charge of 12 cents per 100 lbs. This additional charge was allowed by the Commission in order to defray the rapidly rising terminal expenses. (ExParte increases are geared primarily to *line-haul* costs.) This 12 cents accrued to the line-haul carrier serving the port as such carrier absorbed the expense for loading import cargo.

The railroads' costs for performing shipside service, however, continued to escalate, and at a much more rapid pace than the amounts recovered under general ExParte increases. In the mean time railroads were unable to increase the 12-cent waterborne charge to an amount that would adequately cover their rising port terminal expense. To protect their revenue, the railroads published maximum absorption provisions to apply in connection with their shipside rates. Insofar as Texas ports are concerned, effective November 8, 1965 (or shortly thereafter depending on the tariff involved), the railroads no longer absorbed handling or wharfage charges in excess of the maximum amounts authorized in TLFB Tariff 21-series. The shipper or his agent was responsible for the excess.

It should be understood that only rates that applied from *shipside* were subject to the added waterborne charge and only these rates were subject to the maximum absorption provisions. It should be further understood that the added waterborne charge was not identified as applying for any specific service. It merely accrued to the carrier performing port terminal services or bearing the expense of such service.

II

A two-factor rate is the second category of import rates referred to earlier. This rate is generally comprised of the domestic line-haul rate (one factor) plus the charge for port terminal services (second factor) applicable at the rate-making port. These particular rates included all of the port terminal expenses, and the shipper was not required to pay the excess amount that was applicable in connection with shipside rates referred to above.

The second factor reflected the actual terminal expense applicable at the rate-making port, and for that reason the two-factor rates were excluded from the maximum absorption provisions. These particular rates provide a specific amount for a specific service.

III

The third category is non-shipside rates. Such rates include only the line-haul service, and the entire expense of moving import cargo from ship to rail car is borne by the shipper or owner of the cargo.

App. at 33–35.

was based on substantial evidence and expert consideration of transportation policy; the ICC is vested with wide discretion in its area of expertise; ICC orders carry a presumption of validity; it is not the function of the reviewing court to review the wisdom of an ICC order nor the consistency of that order with prior administrative decisions; in the matter of tariff interpretation the ICC's determination is to be given full effect absent arbitrariness or abuse of discretion; and, the ICC's decision that Exception 1 to Item 317–H did not apply in the instant case was a reasonable resolution of a difficult regulatory ambiguity. App. at 259–60.

Although the district court's statements concerning scope of review may be appropriate in situations involving judicial review of factual findings of the ICC, they state an inappropriate standard for judicial review of ICC decisions concerning, as in the instant case, questions of law. The standards which a reviewing court must apply to the findings of an administrative agency, like the ICC, are set forth in the Administrative Procedure Act:

To the extent necessary to decision and when presented, the reviewing court shall *decide all relevant questions of law, interpret constitutional and statutory provisions,* and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C.A. § 706 (emphasis added).

Factual findings and findings on mixed questions of fact and law of the ICC are subject to a limited standard of judicial review and are set aside only if "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" or if "unsupported by substantial evidence . . ." *Id. Swearingen Aviation Corp. v. NLRB,* 568 F.2d 458, 463 (5th Cir. 1978). *See generally* 5 B. Mezines, *supra,* note 2, at §§ 51.01–04. Questions of law, unlike questions of fact, are freely reviewable by the courts; the courts are under no obligation to defer to ICC legal conclusions. 5 U.S.C.A. § 706 (see especially the portions emphasized above). *See Allied Chemical & Alkali Workers v. Pittsburg Plate Glass Co.,* 404 U.S. 157, 182, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971); *Swearingen Aviation, supra,* 568 F.2d at 463. The central issues in the instant case present freely reviewable questions of law.

As one commentator has suggested, often questions of fact and questions of law are inextricably entangled. 5 B. Mezines, *supra,* note 2, at § 51.01. Historically, the law-fact dichotomy has long produced disagreement and confusion. *See, e. g.,* 5 B. Mezines, *supra,* note 2, at § 51.01 n. 6; 4 K. Davis, Administrative Law Treatise, §§ 30.-01–11 (1958 & 1970 supp.); L. Jaffee, Judicial Control of Administrative Action, 546–94 (1965). But many cases arise, where as here, the questions of law are clearly separate and apart from factual disputes.

To decide this appeal, we must consider two basic questions. In the first place, is the waterborne charge "in addition to the line haul rate?" SWL Tariff 108–U, I.C.C. 4654. Secondly, does the waterborne charge "provide stated amounts for port terminal services or for loading or unloading?" A negative answer to either question

defeats Coca-Cola's claim. Clearly, we must interpret the language of the tariff to reach our decision.

Tariffs filed with the ICC are binding contracts between the carrier and the shipper. *See Great N. Ry. v. Merchants Elevator Co.,* 259 U.S. 285, 291, 42 S.Ct. 477, 66 L.Ed. 943 (1922); *Penn Central Co. v. General Mills, Inc.,* 439 F.2d 1338 (8th Cir. 1971). They have the force of law and are treated with the same import as statutes. *Illinois Cent. Gulf R.R. v. Golden Triangle Wholesale Gas Co.,* 586 F.2d 588, 592 (5th Cir. 1978). The task of interpretation of tariffs filed with the ICC is akin to the task of statute interpretation, and like statutory interpretations, tariff interpretations involve mainly questions of law. There may of course be ancillary factual determinations which must be made in interpreting a particular tariff.

Mr. Justice Brandeis, in the landmark case of *Great N. Ry., supra,* addressed the question of whether construction of a tariff involved a question of fact or of law. The issue was whether orders for reconsignment after inspection were "disposition orders" within the coverage of an exemption provision of the tariff. If so, the shipper would not have to pay a $5.00 per car reconsignment fee. The carrier argued that the courts, under the doctrine of primary jurisdiction,[9] were without jurisdiction to construe the tariff until the "true construction" was determined by the ICC. *Id.* at 289, 42 S.Ct. 477. The Court rejected this argument and held that "[e]very question of the construction of a tariff is deemed a question of law . . . ." and, under the doctrine of primary jurisdiction, questions of law, unlike questions of fact, are originally cognizable in the courts without preliminary resort to the ICC. *Id.* at 289–90, 42 S.Ct. at 479. Nevertheless the Court issued a *caveat* to the basic proposition that the construction of tariffs involves questions of law:

> [W]hat construction shall be given to a railroad tariff presents ordinarily a question of law which does not differ in character from those presented when the construction of any other document is in dispute. * * *

> But words are used sometimes in a peculiar meaning. Then extrinsic evidence may be necessary to determine the meaning of words appearing in the document. This is true where technical words or phrases not commonly understood are employed. Or extrinsic evidence may be necessary to establish a usage of trade or locality which attaches provisions not expressed in the language of the instrument. Where such a situation arises, and the peculiar meaning of words, or the existence of a usage, is proved by evidence, the function of construction is necessarily preceded by the determination of the matter of fact.

*Id.* at 291–92, 42 S.Ct. at 479.

The confusing law vis-a-vis fact distinction was again before the Supreme Court in *United States v. Western Pac. R.R.,* 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). There the issue was whether bomb casings, which contained napalm gel, a gasoline and aluminum soap powder mixture, but no fuse or burster charge, were "incendiary bombs" subject to a high tariff or "gasoline in steel drums" subject to a low tariff. *Id.* at 61, 77 at S.Ct. 161. The Court reasoned that the question of which rate to apply depended on whether the cost factors requiring the high carriage rate for incendiaries were present in the carriage of the incomplete bombs. The determination of these underlying cost factors was deemed a proper matter for initial determination by the ICC. Even though the issue could be phrased as one of tariff construction, the real issue was whether the high rate was a "reasonable" rate for carriage of the incomplete bombs. The Court emphasized that in many instances tariff construction cases are originally cognizable in the courts as, for example, when the ICC has previously construed the tariff or where construction of the tariff does not require examination of the underlying cost factors. But, concluded the Court,

**9.** See note 2, *supra.*

where, as here, the problem of cost-allocation is relevant, and where therefore the questions of construction and reasonableness are so intertwined that the same factors are determinative on both issues, then it is the Commission which must *first* pass on them.

*Id.* at 69, 77 S.Ct. at 168 (emphasis added).

As the foregoing discussion indicates, *Western Pacific* tempered the rather sweeping language of *Great N. Ry.* by stating that where questions of reasonableness are involved, tariffs must *initially* be construed by the ICC. *Louisiana & Ark. Ry. v. Export Drum Co.*, 359 F.2d 311, 314 (5th Cir. 1966); *see* Jaffee, *Primary Jurisdiction*, 77 Harv.L.Rev. 1037, 1043–47 (1964). However, for present purposes it is important to note that *Western Pacific* did not eliminate the basic proposition that tariff interpretations generally involve questions of law. Furthermore, *Western Pacific* did not overrule *Great N. Ry.*, but expressly reaffirmed it. *Western Pacific, supra*, 352 U.S. at 69, 77 S.Ct. at 161.

■ The district court properly referred the present controversy to the ICC because there was a contention that the words of the tariff were not used "in their ordinary meaning". *Great N. Ry., supra*, 259 U.S., at 291–92, 42 S.Ct. at 477. However, the findings of the ALJ, the ICC and the district court reveal that the words of the tariff were not used in any peculiar or technical sense any more than any words in any railroad tariff are used in a peculiar or technical sense. See *Great N. Ry., supra*. The peculiar or technical sense standard does not cover all tariff construction cases. *Cf. Louisiana & Ark. Ry. v. Export Drum Co., supra*, 359 F.2d at 314–15 (holding that not all tariff interpretations require consideration of the "underlying cost allocation" factors discussed in *Western Pacific*).

The district court's referral was also proper because there is a factor of reasonableness involved in the construction of this tariff. *Western Pacific, supra*, 352 U.S. at 69, 77 S.Ct. at 161. Does application of the maximum absorption tariff produce a reasonable charge for the services rendered by the railroads, taking into account the "underlying cost-allocation?" *Id.* While the ICC decision is rather cryptic, we think it clear that the agency determined that the addition of the waterborne charge did result in a reasonable charge for the services rendered.

■ It is apparent that considerations of reasonableness and underlying cost-allocation, matters within the special competence of the ICC, reflect one of the rules of tariff construction. Tariffs should be construed to avoid unjust or improbable results, and an interpretation that is reasonable and consistent with the purpose of the tariff is preferred. *National Dairy Products Corp.-Kraft Foods Division v. Missouri-Kan.-Tex. R.R.*, 385 F.2d 173, 177 (5th Cir. 1967); *National Van Lines, Inc. v. United States*, 355 F.2d 326, 332 (7th Cir. 1966); *Pennsylvania Central Co., supra*, 439 F.2d at 1341. This rule however is only one of several tariff construction rules. Once the ICC has resolved the reasonableness rule, the courts are still left with the task of applying the other rules of tariff construction.

■ There were two factual prongs involved in the instant controversy. The ICC has resolved both and a reviewing court may not interfere with this determination so long as it is supported by substantial evidence. 5 U.S.C.A. § 706. These ICC determinations are supported by substantial evidence. Therefore, this court, like the district court before us, is faced with a pure question of law because the entwined questions of fact have been determined by the ICC. The ICC's construction of the tariff is freely reviewable and this court is not *obligated* to accept the construction of the agency. Nonetheless Coca-Cola comes into court with one strike against it; one significant tariff construction rule, reasonableness, has already been decided against it.

■ In interpreting tariffs, the terms are read in the sense in which generally used. *Pennsylvania Central Co., supra*, 439 F.2d at 1340–41. Both sides of this dispute have made very plausible arguments in support of their construction of the tariff. Coca-

Cola argues that the ICC in its published decisions has held that the waterborne charge is not a part of the line haul rate but is in addition to the line haul rate. See *International Multifoods Corp. v. Atchison, T. & S. F. Ry.*, 343 I.C.C. 373, 375 (1973); *Cancellation of Wharfage Absorption, supra*; *Ex Parte No. 223*, 311 I.C.C. 372, 417 (1960); *Ex Parte 212, supra*. We have considered these previous decisions of the ICC and they are indeed susceptible to Coca-Cola's reading of them. The railroads and the ICC cite two of the same ICC decisions and argue, contrary to Coca-Cola, that the decisions support their interpretation of the tariff. See *Cancellation of Wharfage Absorption, supra*; *Ex Parte No. 212, supra*. We think that the ICC decisions can equally be read as the railroads and the ICC would read them. Review of the prior ICC decisions leads us to conclude that either reading comports with the plain meaning of the words used.

■ A specific tariff provision takes precedence over a more general one where ambiguity exists. *Indiana Harbor Belt R.R. v. United States*, 510 F.2d 644, 650 (7th Cir. 1975), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694. The waterborne charge is a general charge which partially defrays port terminal expenses while the maximum absorption tariff is a more specific provision which sets an exact maximum amount of wharfage expense which the railroads absorb. Therefore, if all other factors were equal, the maximum absorption provision would prevail.

■ Exceptions to tariffs are strictly construed and only situations clearly within an exception provision are excepted from application of the tariff. *Union Pac. R.R. v. United States*, 184 Ct.Cl. 785 (1968). Coca-Cola seeks the benefit of Exception 1 to the maximum absorption tariff and concedes that but for the exception it would be subject to the maximum absorption tariff.

■ Generally an ambiguous tariff is construed against the drafter, in this instance the railroads. *E. g., Strickland Transportation Co. v. United States*, 334 F.2d 172 (5th Cir. 1964); *United States v. Strickland Transportation Co.*, 200 F.2d 234 (5th Cir. 1952). But as this court has previously admonished, we must resist the "temptation to take the ambiguity route as an easy and quicker way out." *Louisville & Nash. R.R. v. Knox Homes Corp.*, 343 F.2d 887, 892 (5th Cir. 1965); *Strickland Transportation Co. v. United States, supra*, 334 F.2d at 177. Even though the question is one of law, divination of the meaning of tariffs, which often have the perplexing countenance of "a mixture of a section of the Internal Revenue Code and a patent claim", is often a difficult task. *Louisville & Nash. R.R. v. Knox Homes Corp., supra*, 343 F.2d at 892. There is merit to the argument made below that "any good commerce lawyer, given a set of Tariffs (sic), can make a strong ambiguity argument." Record, vol. III, at 199. Furthermore, strict construction against the drafter of a tariff is not justified if it ignores an alternate, reasonable construction which conforms to practical application and the intent of the drafters or if other rules of tariff construction outweigh the ambiguity rule. *National Van Lines, supra*, 355 F.2d at 333. In the instant case the ambiguity rule is outweighed by other rules of construction. Moreover, strict adherence to the ambiguity rule would ignore another more reasonable interpretation in line with the intent of the drafters. The record indicates that there is an unabsorbed portion of the wharfage expense not covered by the basic line haul rate or the waterborne charge. The railroads would have to recoup that expense somewhere, either by increasing all line haul rates or by increasing the waterborne charge. Manifestly the ICC did not find these alternatives reasonable. It is not our function to interfere with the ICC's findings in this regard, 5 U.S.C.A. § 706, and we decline to do so.

■ The final rule of tariff construction applicable to the instant situation is that even ICC *findings of law* involving tariff construction are entitled to some deference or weight. This rule, unlike the statutory requirement that factual findings of the ICC be upheld if supported by sub-

stantial evidence, is not conclusive. *Id. Great N. Ry., supra*; *National Van Lines, supra*, 355 F.2d at 333. The instant litigation does not present the application of law to a set of specific facts, sometimes characterized as mixed questions of law and fact, wherein courts are more likely to defer to the administrative agency's interpretation. *See Pittston Stevedoring Corp. v. Dellaventura*, 544 F.2d 35, 49–50 (2d Cir. 1976), affirmed, *Northeast Marine Terminal Co., Inc. v. Caputo*, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977). On the contrary, since the ICC has already resolved the possible factual issues, we are faced with a very general issue requiring no reference to the specific underlying facts. On this ground the instant case is distinguishable from cases that require the reviewing court to determine whether a given factual situation comes within the language of a tariff or regulation. *See, e. g., Western Pacific, supra* (Are bombs without fuses and bursters "incendiary bombs?"); *General Motors Corp. v. United States*, 324 F.2d 604, 605 (6th Cir. 1963) (Are bumper back bars and stabilizer bars for autos "automobile parts or accessories" or "forgings?"); *Seaboard Airline R.R. v. United States*, 181 Ct.Cl. 719, 387 F.2d 651 (1967) (Are de-icers and decontaminators "sprayers?"). Nevertheless, even where the issue is one of pure law, such as interpretation of contracts, tariffs, regulations and statutes, room still is present for deference to the views of administrative agencies, particularly where the understanding of the problem is enhanced by the agency's expert understanding of the industry. *Base Billeting Fund v. Hernandez*, 588 F.2d 173, 176 (5th Cir. 1979); *Columbia Gas Transmission Corp. v. Federal Power Commission*, 174 U.S.App.D.C. 204, 530 F.2d 1056 (D.C.Cir. 1976). We emphasize however that this deference to an administrative agency's decisions on questions of law is not conclusive.

■ The thread of the rule can be found in decisions interpreting statutes, regulations, staff opinion letters, agency rules, contracts and tariffs. Courts generally grant "great deference" to an agency's interpretation of its enabling statute. *E. g.,*

*Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1975); *Adkins v. Hampton*, 586 F.2d 1070, 1073 (5th Cir. 1978); *Fredericks v. Kreps*, 578 F.2d 555, 561 (5th Cir. 1978). But of course deference to an agency's interpretation of its statute is limited by the courts' obligation "to honor the clear meaning of the statute, as revealed by its language, purpose and history", *International Brotherhood of Teamsters, Warehousemen & Helpers of America v. Daniel*, 439 U.S. 551, 99 S.Ct. 790, 800 at note 20, 58 L.Ed.2d 808 (1979), and by the requirement that the agency interpretation not be clearly wrong or unreasonable. *Fredericks v. Kreps, supra*, 578 F.2d at 561.

■ An administrative agency's interpretation of its own regulation is also given "weight" or "great deference." *E. g. Udall v. Tallman, supra*; *Builders Steel Co. v. Marshall*, 575 F.2d 663, 666 (8th Cir. 1978) (agency's interpretation given "significant weight provided it is a reasonable one"). This court has held that an agency's interpretation of its own regulation is controlling "as long as it is one of several reasonable interpretations, although it may not appear [to the court] as reasonable as some other". *Brennan v. Southern Contractor's Service*, 492 F.2d 498, 501 (5th Cir. 1974); accord, *U. S. Pipe & Foundry Co. v. Webb*, 595 F.2d 264, 272 at note 8 (5th Cir. 1979). But a regulation may not be interpreted to say what an agency intended to say but failed to adequately express. *Usery v. Kennecott Copper Corp.*, 577 F.2d 1113, 1119 (10th Cir. 1977); see also *Diamond Roofing Co. v. OSHA*, 528 F.2d 645, 649 (5th Cir. 1976).

The Court of Claims has held that a contractual interpretation by an administrative agency within its area of expertise is entitled to "weight and respect" if based on sound reasoning. *H & M Moving, Inc. v. United States*, 204 Ct.Cl. 696, 499 F.2d 660, 670 (1974). This court has held that staff opinion letters of an administrative agency interpreting regulations, although less authoritative than regulations or formal decisions, are entitled to be "weighed carefully"

and to "great deference" if they state a reasonable conclusion. *Charles v. Krauss Co.*, 572 F.2d 544, 548 (5th Cir. 1978).

 Administrative interpretations of tariffs are likewise entitled to weight and respect. *Indiana Harbor Belt R.R. v. United States, supra,* 510 F.2d at 649–50. It matters little whether following an agency determination is called "great deference", "great weight", "weighed carefully", "respect", "significant weight" or any similar appellation. It is impossible to quantify exactly the weight an administrative interpretation will be given in a particular situation. The agency determination is simply weighed against other factors, but it is not conclusive because, in the final analysis, "the legal standard to be applied is ultimately for the courts to decide and enforce." *Swearingen Aviation Corp., supra,* 568 F.2d at 463, quoting *Allied Chemical & Alkali Workers v. P.P.G. Co.,* 404 U.S. 157, 182, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971).

The railroads and Coca-Cola presented plausible interpretations of the ambiguous tariff provisions. The ICC's interpretation agreed with that of the railroads. In the rather murky light shed on our problem by the rules of tariff construction explicated above, we conclude that Coca-Cola has not demonstrated that the ICC's (and the railroads') interpretation is incorrect. This means that Coca-Cola is not entitled to the refunds it seeks of moneys paid under the maximum absorption tariff.

While the district court selected the wrong standard of judicial review, its ultimate conclusion, upholding the ICC order, was right. It's judgment is

AFFIRMED.