**SCOPE IMPORTS, INC., Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION, and United States of America, Respondents.**

No. 81–4318.

United States Court of Appeals, Fifth Circuit.

Oct. 12, 1982.

Rehearing Denied Nov. 26, 1982.

Roger B. Greenberg, Mark S. Finkelstein, Houston, Tex., for petitioner.

Linda J. Joachim, Richard J. Osterman, Jr., I.C.C., Washington, D.C., Kenneth Kolson, John J. Powers, III, U.S. Dept. of Justice, Washington, D.C., for respondents.

Leland E. Butler, San Francisco, Cal., Michael B. Hughes, Galveston, Tex., Frederick G. Pfrommer, San Francisco, Cal., for Atchison, Topeka and Santa Fe Ry. Co.

Before RUBIN and JOHNSON, Circuit Judges, and DUPLANTIER *, District Judge:

ALVIN B. RUBIN, Circuit Judge:

■ A tariff for ocean and rail movement of containers provides that demurrage [1] begins five days after the "consignee is advised" that the containers are "available for customs inspection." The consignee of a number of containers shipped to Houston, Texas, contends that the Interstate Commerce Commission (ICC *or* Commission) erred in finding that it received adequate notice. The consignee also claims that, because customs inspectors in Houston will inspect containers only when they are delivered to the customs area, the ICC erred in finding that the containers were available for Customs Service inspection when they arrived at the railroad's Houston facility. This assertion involves the question whether the railroad was entitled to demurrage if it failed to provide the means of moving the containers from the terminal, where they were unloaded, to the customs inspection warehouse. Concluding that the Commission's findings are supported by substantial evidence, and that its interpretation of the tariff bears the imprimatur of the Commission's expertise and is not unreasonable, we affirm.

I.

Scope Imports, the petitioner, was consignee of containers of commodities shipped by steamship from various points in the Far East, including Japan, to Los Angeles, California, and thence by rail to Houston, Texas. "Minibridge" rates, published in a joint railroad/water-carrier tariff, governed the terms of the transportation.

The ICC's findings described the typical sequence of events in transporting shipments like the one at issue here. When the

---

* District Judge of the Eastern District of Louisiana, sitting by designation.

1. Demurrage is a storage charge assessed by a rail carrier for the space that a loaded container occupies in its terminal. Rule 145 of the tariff governs the demurrage charges.

steamships reach their destination (here Los Angeles), the ocean carrier unloads the containers and arranges for their transfer by motor carrier to the railroad's freight terminal. Some of the containers are mounted on trailer chassis, but it does not appear from the record whether the containers are placed on chassis before the ocean voyage or on arrival. At the railroad terminal, the containers are loaded on flatcars as received. Some of the containers involved in this case were loaded with, and some without, chassis.

▪ The containers are shipped "in bond,"[2] so that customs inspection can take place at the final destination (here Houston) rather than at the port of entry. When the flatcars reach the destination, the railroad unloads the containers in its storage yard.[3] There is no evidence in the record concerning where customs inspection takes place at other in-bond terminals, but the parties and the Commission assume that, everywhere but at Houston, Customs Service inspectors make their inspection where the containers are unloaded. In Houston, however, Customs officials will inspect only at a designated site within the railroad terminal area. Therefore, it is necessary to move the containers from the place of unloading to the customs inspection area. This can be accomplished by providing chassis for those containers not already mounted, and then moving them by truck or by moving the unmounted container with a crane. The record contains no evidence concerning who provides the tractor to move mounted chassis. Although the case was tried under the modified procedure prescribed by Commission Rules 43–52, 49 CFR § 1100.43–.52 (1981), the deficiencies in the record cannot be attributed to the procedure, for each party had ample opportunity to submit affidavits stating the facts. Rule 47, 49 CFR § 1100.47.

After customs clearance, the containers are taken to the consignee's facilities, also within the railroad terminal area, for unloading. Then the empty containers are returned to the railroad for re-use. The record contains no evidence concerning who moves the containers to the place where they are unloaded or who returns them when empty.

The steamship company prepares several transportation documents. The water carrier prepares an intermodal bill of lading, including a description of the cargo, its weight, and the shipping charges. The ocean carrier also prepares a manifest, listing each container and its customs immediate transport numbers, and a Customs Service immediate transport (IT) entry form. Customs requires the IT form for the entry and control of freight being forwarded "in bond" to permit transportation, without inspection at the point of entry, to the place where inspection is to be performed. The manifest and IT form either accompany the shipment or are mailed to the rail carrier's agent at the shipment's destination.

The railroad prepares a waybill for delivery of the cargo based on the manifest and IT entry form. The waybill accompanies the shipment.

The ocean carrier ordinarily does not enter the consignee's name on either the manifest or the IT entry form; instead, the manifest designates a "notify party," usually the local agent of the steamship company, and the IT entry form usually lists the consignee's customs broker. The name of the consignee appears on the ocean shipper's bill of lading, but the railroad never sees that document. Its only need for the consignee's name would be for billing purposes, but under this tariff, the railroad simply divides revenue with the water carrier on a flat per-container basis.

When the containers arrive in Houston, the railroad delivers the appropriate manifest and the IT entry form to customs, which marks them with an official stamp

---

2. The rail carrier here provided the bond, as Customs Service regulations require.

3. The railroad will place containers not mounted on chassis onto chassis, but only if the consignee or ocean carrier furnishes the chassis. The railroad does not furnish chassis; if no chassis is provided, the railroad places the container on the ground.

showing the date and time. Customarily, as soon as the containers are unloaded, the railroad telephones the person named in the manifest as "notify party." The steamship company's representative then telephones this information to the consignee's customs broker, which ordinarily begins its effort to clear the containers through customs the next day. (Braverman, Scope's customs broker began attempting to obtain customs clearance on the containers here involved on the day after the railroad telephoned the notify party.) The railroad uses the date stamped on the IT form to compute "free time."[4] The present controversy involves demurrage charges for 170 containers, which the consignee failed to remove from the railroad's storage area for more than five days after receiving notice. The charges range from $10.00 for one day after the expiration of free time to $1,888.00 for approximately thirty-nine days.

Scope's complaint to the Commission attacked rule 145 of the Trans-Pacific tariff, which governed the shipments at issue. This rule reads:

> Free time will commence at 8:00 am on the first working day after *consignee is advised* container is *available for customs inspection* and shall expire on the fifth day .... (emphasis added).

Scope contends that it was never properly advised that the containers were available for customs inspection. In the pleadings and affidavit, Scope appears to assert that it had some kind of notice, but that the notice did not comply with the requirements of the tariff because: first, the railroad did not communicate directly with Scope; second, in any event, its customs broker was not its agent for the purpose of receiving notice; and, third, the notice given was that the containers had "arrived," not that they were "available for customs inspection."[5] Scope finally contends that, even if the railroad gave sufficient notice, the containers were not "available" for inspection until delivered to the customs area.

## II.

The Commission rejected Scope's claim that notice must be given to the consignee, concluding that notice to the consignee's agent satisfied the tariff requirement. It observed that the normal course of business is for the railroad to give notice to the "notify party," who in turn notifies the customs broker. It found that Scope's customs broker, Braverman, "filed the instant complaint" and "appears to have a greater agency authorization" than merely obtaining customs clearance. Thus, the ICC found that the broker was the consignee's agent and that the agency was not limited to obtaining customs clearance, but included the power to receive notice of the shipment's arrival. The Commission's conclusion that Braverman was either the actual or apparent agent of Scope, see Restatement (Second) of Agency §§ 7, 8, is supported by substantial evidence, and we, therefore, affirm that conclusion. *See Consolo v. Federal Maritime Commission*, 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966); *Watkins Motor Lines v. ICC*, 641 F.2d 1183 (5th Cir. 1981).

The tariff does not require the railroad to give notice to the consignee; it requires only that the consignee "[be] advised" that the container is available. The purpose of the notice is to give the consignee five "free" days within which to obtain customs clearance and to remove the container from the railroad's storage area. It is apparent here that Braverman, acting for Scope, was in fact notified of the containers' arrival. It is not important that the

---

**4.** The tariff allows the consignee to pick up the containers without demurrage charges from 8:00 am on the first working day after it is advised the containers are available for customs inspection until 5:00 pm on the fifth day (excluding weekends and holidays). After "free time" expires, demurrage is assessed at rates provided by the tariff.

**5.** At oral argument, Scope's counsel asserted that notice was *never* given and that Scope learned fortuitously of the arrival of the containers. This apparently contradicts the position previously taken by Scope, and is without support in the record. The exact factual basis for the contention is not clear.

notice to Braverman recited the "arrival" of the containers rather than their "availability" for customs inspection. The parties understood that the notice meant that, in the railroad's opinion, the containers were "available," so what was said sufficed. The tariff does not require an incantation to be given only to one person and only by reciting a prescribed formula. Its purpose was evidently performed.[6]

### III.

Scope contends, however, that the containers were not actually "available for customs inspection," arguing that they become available only when moved to the customs inspection site. Scope argues that the carrier should be required to move the containers to the inspection site, and that, until the railroad performs that function, the containers are not "available" because customs will not inspect them. Scope bolsters this claim with a letter from a customs official stating that customs does not consider the containers to be available for its inspection until they are in the designated area.

Scope finds the *railroad's* obligation to transport the containers in rule 145, which it asserts to be ambiguous when read in the light of rule 55.[7] The Commission found no ambiguity in rule 55.

The Commission concluded that, giving this rule a fair reading in its entirety and interpreting it in light of the facts attendant to the handling and movement of these containers, it simply means that, if the containers are not mounted on chassis when the railroad receives them, it will affix the containers to chassis when they are unloaded at their destination. The tariff includes the charge for mounting; it does not require the railroad to supply the chassis.

The ICC determined that, between the railroad and the consignee, the burden of supplying the trailer chassis rests on the consignee as "the party who stands to lose by not promptly taking possession of the containers." It declined to determine whether the water carrier has a duty to furnish chassis but it ruled that, if the water carrier has this duty, the railroad is not responsible for the water carrier's omissions. The Commission concluded that: "Neither the custom of the trade as evidenced in the record . . . nor the wording of rule 55 warrant this result," and, therefore, that rule 55 does not compromise rule 145.

The Commission then considered rule 145, standing alone, and found that the rule neither states nor appears to mean that the railroad has a duty to transfer the containers from the unloading ramp to the customs inspection site before they are considered "available for customs inspection." The ICC held that it would be unreasonable to require the railroad to furnish both the chassis and the tractors to move unmounted containers, or to furnish tractors for containers already mounted on chassis. "The record indicates that, generally, the railroads do not provide [this] service."

The Commission itself went beyond the record, as did the administrative law judge, by finding that the custom in the trade does not support imposing a duty on the railroad to deliver the containers to the inspection site, and that the railroads do not hold themselves out as performing such service. However, when this conclusion is stripped from the findings, there is still nothing in the record indicating that the railroad has a duty to supply a chassis or to transport the

---

6. The Commission has now revised the tariff to permit notice to a consignee or its agent. This revision reflects industry practice, as does the conclusion of the ICC in this case.

7. Rule 55, in applicable part, provides:
   SERVICE BY RAIL CARRIERS
   .   *   *   *   *   *·   *
   B. Rates in this tariff include the unloading of Containers, with or without chassis, from rail cars. *In the event Containers are not moving on chassis, rates in this tariff will include the placing of Containers on chassis furnished by consignee or provided by carrier and will also include affixing the Containers to chassis. If consignee elects to take delivery on open flat bed trucks or trailers, rates named herein will include placing Containers without chassis on such vehicles but will not include securing Containers on such vehicles.* (Emphasis added.)

container from its unloading point to the customs area.

Scope urges that the tariff must be ambiguous because the ALJ and Division 1 of the Commission interpreted it differently from the intermediate board of review which, in turn, interpreted it differently from the railroad. Seizing on this definition of ambiguity, Scope then argues that the Commission should have construed the tariff against the carrier and that it erred in failing to do so.

That two readers find different meanings in the same words does not establish their ambiguity. The finding that a sentence difficult to interpret is ambiguous and that all ambiguity must be construed against the author is a facile way to solve the problem of interpretation, but not necessarily an accurate one. We resist the "temptation to take the ambiguity route as an easy and quicker way out." *Coca-Cola Co. v. Atchison, Topeka & Santa Fe Railroad,* 608 F.2d 213, 221 (5th Cir. 1979) (quoting *Louisville & Nashville Railroad v. Knox Homes Corp.,* 343 F.2d 887, 892 (5th Cir. 1965)).

Tariffs should be construed to avoid improbable results, and to reach a reasonable result consistent with the tariff's purpose. *Coca-Cola,* 608 F.2d at 220–21. The Commission, not the review board, has the duty to render final decisions based on record evidence. The Commission, not the review board, establishes ICC precedent. Here the Commission found no ambiguity in the tariff, patent or latent. The interpretation of tariffs is peculiarly within the expertise of the Commission. Although this skill does not warrant the abdication of judicial responsibility, it is entitled to deference. *See Coca-Cola,* 608 F.2d at 222.

For these reasons, the judgment is AFFIRMED.