**REBEL MOTOR FREIGHT, INC.,**
**Plaintiff–Appellant,**

v.

**INTERSTATE COMMERCE COMMIS-**
**SION and Diamond–Bathurst, Inc., De-**
**fendants–Appellees.**

No. 91–6091.

United States Court of Appeals,
Sixth Circuit.

Submitted April 14, 1992.

Decided Aug. 11, 1992.

James N. Clay, III (briefed), Memphis, Tenn., for plaintiff-appellant.

Robert F. Miller, McDonnell & Boyd, Memphis, Tenn., Richard A. Ifft (briefed), Henry Roemer McPhee, Hopkins, Sutter, Hamel & Park, Washington, D.C., for defendant-appellee Diamond–Bathurst, Inc.

Ed Bryant, U.S. Atty., Memphis, Tenn., Cecilia E. Higgins, Judith A. Albert (briefed), Office of the Gen. Counsel, Washington, D.C., for defendant-appellee I.C.C.

Before: MERRITT, Chief Judge; MILBURN, Circuit Judge; and BROWN, Senior Circuit Judge.

MILBURN, Circuit Judge.

Plaintiff-appellant Rebel Motor Freight, Inc. ("Rebel") appeals the summary judgment granted by the district court to defendant Diamond–Bathurst, Inc., affirming the Interstate Commerce Commission ("ICC") and dismissing Rebel's petition for review. On appeal, the sole issue is whether plaintiff Rebel's tariff publication practices, found to be unreasonable by the ICC, can abrogate the plain language of its published tariff which requires a higher tariff than was collected from defendant Diamond–Bathurst, Inc., thereby preventing Rebel from collecting alleged undercharges for shipments of defendant's glassware. For the reasons that follow, we affirm.

## I.

### A.

This action was commenced by plaintiff Rebel in Tennessee state court and removed to the district court on August 26, 1986. Rebel brought this action against defendant Diamond–Bathurst, Inc. to recover $137,823.03 in alleged tariff undercharges for shipments of glassware that it carried on behalf of Diamond–Bathurst, Inc. from Jackson, Mississippi to Memphis, Tennessee, between 1983 and 1984.

The district court referred the matter to the ICC which released its decision on February 3, 1989. The ICC found in favor of Diamond–Bathurst, Inc.[1] ("Diamond") on two grounds. First, the ICC determined that pursuant to its negotiated rates policy, Rebel and Diamond had negotiated a lower rate, and thus Rebel could not seek undercharges based upon another higher rate. Second, the ICC determined that Rebel's tariff publication practices were so confusing and ambiguous that they constituted an unreasonable practice, and collection of undercharges was inappropriate. The case was then remanded to the district court for further proceedings.

Both parties made motions for summary judgment, and Rebel sought review of the ICC's decision. Subsequent to the ICC's decision, but before the district court reached a decision, the Supreme Court in *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990), determined that the ICC's negotiated rates policy was inconsistent with the "filed rate doctrine" and thus was unlawful. Accordingly, the district court in its opinion acknowledged that the ICC could not be affirmed on the basis of the negotiated rates policy. However, the district court affirmed the ICC on the ground that Rebel's tariff publication practices were, in fact, confusing and ambiguous, and, therefore, Rebel was not entitled to collect the alleged undercharges. Judgment was entered in favor of Diamond on

---

1. After the commencement of litigation, Diamond was acquired by Anchor Glass Container Corp., which continues to defend this action as the successor in interest to Diamond Bathurst, Inc.

August 27, 1991. This timely appeal followed.

### B.

Diamond[2] was a manufacturer and distributor of glass containers. Rebel is a motor common carrier operating in interstate commerce with its principal place of business in Memphis, Tennessee. Rebel ceased active operations as a common carrier in early 1986 and is now leasing its equipment.

From July 1983 to February 1984, Rebel made 666 shipments of Diamond's glass containers from Diamond's plant in Jackson, Mississippi, to Memphis, Tennessee. Rebel billed Diamond $243.05 for each of the shipments pursuant to Item 400 in its own, private tariff, ICC REBL 332–B[3] which was in effect on March 10, 1983, and was cancelled on February 6, 1984. The freight bills for the shipments contained Rebel's stamp indicating the shipments moved under tariff ICC REBL 332–B, and Diamond paid the billed amount for each shipment.

The ICC found that the rate was published specifically to accommodate Diamond's shipments from Jackson, Mississippi, to Memphis, Tennessee. However, sometime later, Rebel claimed that under Item 110 of tariff ICC REBL 332–B, the $243.05 per trailer rate did not apply, and instead a higher rate contained in tariff ICC SMC 214–C was due. Tariff ICC SMC 214–C (Supplements 11 and 18, effective April 25, 1983, and August 8, 1983, respectively) was a group tariff published by the Southern Motor Carrier Rate Conference ("SMC") to establish rates for a large number of motor carriers. This tariff was in effect during the time that Rebel transported Diamond's glassware.

Item 110 of Rebel's private tariff, ICC REBL 332–B, provides in relevant part that

[s]pecific commodity rates named in this tariff may be used only when no truckload commodity rates are published in ... ICC SMC ... tariffs to apply on the same commodity from and to the same point.

J.A. 23. Tariff ICC SMC 214–C provides for a rate of $1.45 per 100 pounds with a minimum weight of 30,000 pounds for the movement of glassware from Jackson, Mississippi, to Memphis, Tennessee, almost twice as much as the rate under ICC REBL 332–B.

### II.

### A.

In this case, each of the parties asserts a different standard of review. Rebel argues that tariff interpretation is the primary focus of this case and that the ICC interpretation of the tariffs at issue should be reviewed de novo because tariff interpretation is a pure question of law, and the ICC's interpretation is clearly erroneous. Diamond agrees that tariff interpretation is a question of law to be reviewed de novo; however, it argues that the real issue in this case concerns the ICC's finding of unreasonable tariff publication practices which is subject to limited review under the Administrative Procedure Act, 5 U.S.C. § 706. In its review of the ICC's decision, the district court focused primarily on tariff construction and concluded that while tariff construction constitutes a question of law, the ICC's interpretation is entitled to deference even though that interpretation is not conclusive.

 In fact, the district court applied the proper standard of review as it relates to tariff construction. The interpretation of a tariff is a question of law. *W.P. Brown & Sons Lumber Co. v. Louisville & N.R. Co.*, 82 F.2d 94, 95 (6th Cir.1936), *aff'd*, 299 U.S. 393, 57 S.Ct. 265, 81 L.Ed. 301 (1937); *Dunlop Tire & Rubber Corp.*

---

**2.** Diamond was the successor corporation to Container General Corporation and Container General Corporation was the successor to Glass Container Corporation. However, to simplify matters, each of these corporations is simply referred to as Diamond.

**3.** Item 400 initially specified a rate of $238.28 per trailer but pursuant to Supplement 1 to ICC REBL 332–B, effective April 1, 1983, the rate was increased to $243.05.

*v. ICC,* 724 F.2d 349, 350 (2d Cir.1983) (per curiam); *Missouri Pac. R.R. v. Independent Mills, Inc.,* 706 F.2d 1080, 1083 (10th Cir.1983) (per curiam); *see also Coca–Cola Co. v. Atchison, T. & S.F. Ry. Co.,* 608 F.2d 213, 219 (5th Cir.1979).[4] Thus, a court may "freely review" the ICC's construction of a tariff. *Cleveland Elec. Illuminating Co. v. ICC,* 685 F.2d 170, 173 (6th Cir.1982) (per curiam); *Missouri Pac. R.R.,* 706 F.2d at 1083; *Dunlop Tire & Rubber Corp.,* 724 F.2d at 350; *Coca–Cola Co.,* 608 F.2d at 218. Nevertheless, while we may freely review the ICC's interpretation of a tariff, the agency's interpretation may be accorded deference due to the agency's expertise in the industry. *Dunlop Tire & Rubber Corp.,* 724 F.2d at 350–51; *Coca–Cola Co.,* 608 F.2d at 222. However, while an agency's interpretation is entitled to deference, it is not necessarily conclusive. *W.P. Brown & Sons Lumber Co.,* 82 F.2d at 95; *Missouri Pac. R.R.,* 706 F.2d at 1083; *Coca–Cola Co.,* 608 F.2d at 222.

■ However, as will be discussed, statutory construction, as well as tariff construction, is relevant to an analysis of this case. An agency's statutory interpretation is properly reviewed pursuant to 5 U.S.C. § 706(2)(C).[5] When reviewing an agency's construction of a statute which it administers, we must first consider whether Congress has directly addressed the precise question at issue. *Railway Labor Executives' Ass'n v. ICC,* 930 F.2d 511, 514 (6th Cir.1991), *citing Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). If so, then the agency's interpretation is accorded no def-

erence. *Id.; see also Maislin Indus. U.S. v. Primary Steel, Inc.,* 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990) ("Once we have determined the statute's clear meaning, we adhere to that determination under the doctrine of *stare decisis,* and we judge an agency's later interpretation of the statute against our prior determination of the statute's meaning."). However, where interpretation of the statute is not clear, the agency's interpretation is accorded special deference. *Railway Labor Executives Association,* 930 F.2d at 514. Rather than impose our own construction on the statute, we must consider whether the agency's interpretation is based on a permissible construction of the statute. *Id.* As we stated in *Central and Southern Motor Freight Tariff Ass'n v. United States,* 843 F.2d 886, 891 (6th Cir.1988), "[o]ur task ... is not to determine whether we think the [agency's] construction is the best construction, but only to determine whether the [agency's] construction was 'sufficiently reasonable.'" (citation omitted).

Finally, when considering the ICC's decision regarding an alleged unreasonable practice, an issue of fact, we must review the decision pursuant to 5 U.S.C. § 706 of the Administrative Procedure Act. Accordingly, we must set aside a finding by the ICC which is arbitrary and capricious or unsupported by substantial evidence. 5 U.S.C. § 706(2)(A) and (E).

### B.

As previously discussed, Item 110 of Rebel's private tariff, ICC REBL 331–B, states in relevant part:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> \* \* \* \* \* \*
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> \* \* \* \* \* \*
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right....

---

**4.** Where the language of a tariff presents questions relating to the peculiar or technical definition of certain words within the tariff, then extrinsic evidence may be necessary to determine the definition of these words. In such a case, courts should decline to construe the meaning of these words, and instead, defer to the expertise of the ICC. *United States v. Western Pac. R.R.,* 352 U.S. 59, 69, 77 S.Ct. 161, 168, 1 L.Ed.2d 126 (1956); *Coca–Cola Co.,* 608 F.2d at 219–20. However, the technical meanings of words in the tariffs in this case are not at issue.

**5.** 5 U.S.C. § 706 states:
Scope of Review

[s]pecific commodity rates named in the tariff may be used only when no truckload commodity rates are published in ... ICC SMC ... tariffs to apply on the same commodity to and from the same points.

J.A. 23.

■ Rebel asserts that according to the plain language of Item 110, the higher rate which was published in tariff ICC SMC 214–C at the time Rebel transported Diamond's glassware was the applicable rate for the shipments made by Rebel for Diamond. Diamond, however, argues that the higher rate published in the SMC tariff is a *volume* rate, a rate determined per hundredweight of the load carried. Diamond further argues that Item 110 provides for the application of higher rates published in ICC SMC tariffs only where those rates are *truckload* rates. Thus, according to Diamond, because the ICC SMC 214–C tariff is a *volume* rate, Item 110 does not provide for its application. Diamond also argues that disclaimers such as Item 110 are unlawful and thus have no effect. *Diamond raises both arguments for the first time in its appeal to this court.* Issues raised for the first time on appeal are not considered by this court. *Pinney Dock and Transport Co. v. Penn Cent. Corp.,* 838 F.2d 1445, 1465 (6th Cir.), *cert. denied,* 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988). Thus, for our purposes, the meaning and effect of Item 110 on its face is not in dispute. According to the plain language of Item 110, the higher rate found in tariff ICC SMC 214–C is the applicable rate.

■ We must next consider whether the unreasonable publication practices of defendant can abrogate the plain meaning of Item 110. In doing so, it is important to note that plaintiff Rebel on appeal does not specifically challenge the ICC's determination that its tariff publication practices constituted an unreasonable practice. Rather, the primary concern in this case is whether the ICC's decision that Rebel's unreasonable tariff practice precludes it from collecting a higher rate as provided by Item 110 conflicts with the well-established

"filed rate doctrine." 49 U.S.C. §§ 10761 and 10762 of the Interstate Commerce Act form the basis of the "filed rate doctrine." *Maislin Industries,* 497 U.S. at ——, 110 S.Ct. at 2767. Thus, we must first consider whether the ICC's interpretation of these sections, as demonstrated by its decision in this case, conflicts with their clear meanings or whether, absent such a conflict, the ICC is entitled to appropriate deference.

Section 10761(a) provides in relevant part:

> ... a carrier providing transportation ... shall provide that transportation or service only if the rate for the transportation or service is contained in a tariff that is *in effect* under this subchapter. That carrier may not charge or receive a different compensation for that transportation or service than the rate specified in the tariff whether by returning a part of that rate to a person, giving a person a privilege, allowing the use of a facility that affects the value of that transportation or service, or another device.

Emphasis added.

Section 10762 provides in relevant part:

> ... A motor common carrier shall publish and file with the Commission tariffs containing the rates for transportation it may provide under this subtitle....

In *Maislin Industries, U.S. v. Primary Steel, Inc.,* the Supreme Court considered the "filed rate doctrine" and held that a carrier was entitled to recover a higher filed rate, notwithstanding the fact that the carrier had negotiated a lower rate, because the negotiated rate had not been filed and published with the ICC. *Id.* Under the "filed rate doctrine," a common motor carrier ("carrier") cannot charge any rate other than the one published and filed with the ICC. *Maislin,* 497 U.S. at ——, 110 S.Ct. at 2762. A carrier is subject to criminal or civil sanctions where it fails to follow the filed rate. *Id.,* 497 U.S. at ——, 110 S.Ct. at 2762–63. "The filed rate governs the legal relationship between the shipper and the carrier." *Id.* 497 U.S. at ——, 110 S.Ct. at 2765.

The purpose of the "filed rate doctrine" is to prevent discrimination in rates

charged various shippers. *Id.* 497 U.S. at ——, 110 S.Ct. at 2766. 49 U.S.C. § 10741(a) specifically prohibits subjecting a "person, place, port, or type of traffic to unreasonable discrimination." Additionally, 49 U.S.C. § 10704(b)(1) provides that when the ICC determines that a rate or practice violates the act, it "shall prescribe the rate ... or practice to be followed."

Application of the filed rate is so strictly applied that a shipper's ignorance of the filed rate or the carrier's misquotation of the filed rate does not abrogate its application. *Maislin,* 497 U.S. ——, 110 S.Ct. at 2763. Moreover, even equitable defenses cannot suspend a carrier's duty to collect the filed rate and the shipper's duty to pay the filed rate. *Id.* 497 U.S. at ——, 110 S.Ct. at 2766. The Supreme Court has recognized this doctrine as being an "undeniably strict" doctrine which may "work hardship in some cases" but has justified it on the basis that it "embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination." *Id.,* 497 U.S. at ——, 110 S.Ct. at 2766.

Rebel argues that it is entitled to the higher rate because according to the plain language of Item 110, the rate in effect when it transported Diamond's glassware from Jackson to Memphis was the higher rate. Rebel further argues that the fact that it billed Diamond the lower rate and accepted payment at the lower rate does not abrogate its duty to collect the higher rate as provided for by the plain language of Item 110 and the ICC SMC 214–C tariff. (Even though Rebel does not label it as such, this argument is essentially a "filed rate doctrine" argument.) Rebel further argues that because the plain meaning of the tariffs as construed together provides that the higher rate is the rate in effect at the time of shipment, there can be no deviation from the higher rate, regardless of the equities of the situation.

On the other hand, Diamond argues that the sequence in which rates were published and cancelled in tariff ICC REBL 332–B

and tariff ICC SMC 214–C created an ambiguous situation in which a shipper reading the tariffs would be confused and unable to determine for certain which rate applied. Thus, Diamond argues that since the tariffs themselves were ambiguous, under clear precedent the lower rate applies.

Diamond further argues that the ambiguous situation arose in this case when Rebel published its lower rate in tariff ICC REBL 332–B after it had already published rates on the same glassware moving from Jackson to Memphis in tariff ICC SMC 214–C. There were three rates which applied to such shipments in ICC REBL 214–C: (1) a charge of $243.05 per trailer with a maximum weight of 42,000 pounds,[6] (2) a rate of $1.40 per 100 pounds with a minimum of 30,000 pounds, and (3) a rate of $1.15 per pound with a minimum of 36,000 pounds.

However, at the time Rebel published its private tariff ICC REBL 332–B, it cancelled its participation in two of the three rates published in tariff ICC SMC 214–C, but it did not cancel the $1.40 per 100 pound rate, the rate Rebel now argues should apply. As discussed, tariff ICC REBL 332–B provides under Item 400 for a rate of $243.05 per trailer with a maximum weight of 44,-000 pounds. This new rate, according to Diamond, was simply a republication of the $243.05 per trailer rate Rebel had previously cancelled in tariff ICC SMC 214–C, except that the maximum truckload rate was higher, thus representing a rate decrease.

In its decision, the ICC agreed with Rebel's position that if Item 110 in tariff ICC REBL 332–B were to be strictly applied, it would nullify the new rate under Item 400 of tariff ICC REBL 332–B. However, the ICC stated, "[s]uch an interpretation creates an obviously unnatural tariff situation." J.A. 20. According to the ICC, giving effect to the literal interpretation of Item 110 would be an "unnatural tariff situation" because there would have been no reason to publish tariff ICC REBL 332–B if Rebel did not intend it to be the applicable rate. Moreover, the ICC con-

---

**6.** The original rate under tariff ICC SMC 214–C was $235.95 per trailerload; however, subse-

quent increases under tariff ICC SMC 196–K raised the rate to $243.05.

cluded that the fact that Rebel "republished" the $243.05 trailer rate in Item 400 of tariff ICC REBL 332-B indicates that Item 400 was the applicable rate. Otherwise, it would have been unnecessary to cancel the $243.05 rate in tariff ICC SMC 214-C and "republish" it in tariff ICC REBL 332-B.

The ICC observed that even Rebel itself considered the lower rate in tariff ICC REBL 332-B to apply as evidenced by the fact that Rebel billed that rate and accepted payment at that rate. In its decision, the ICC found that when Rebel canceled its rates in tariff ICC SMC 214-C and published tariff ICC REBL 332-B, it "apparently overlooked the terms of Item 110 in its own tariff." J.A. 20. The ICC determined that Rebel simply forgot to cancel *all* the rates in tariff ICC SMC 214-C. Thus, in its decision the ICC concluded: "the application of the actual tariff was left in doubt," and an "obviously confusing and ambiguous situation" was created which should be resolved in favor of the shipper. J.A. 20–21. On appeal, this is basically the argument made by Diamond.

While Rebel does not rely on *Maislin*, there is an important and obvious distinction between *Maislin* and the present case which is instructive when analyzing the principal issue in this case. In *Maislin*, the lower rate had not been published. In this case, the lower rate had been published, even though according to the plain language of Item 110, the higher rate was the applicable rate then in effect. The reason that this distinction is important lies in the rationale underlying the "filed rate doctrine." As previously noted, the purpose of the "filed rate doctrine" is to prevent discrimination in the rates carriers charge various shippers. By requiring all rates to be filed, shippers are able to inspect the various rates and challenge any which they consider to be unreasonable or discriminatory. *Maislin*, 497 U.S. at ——, 110 S.Ct. at 2769. In this manner, the "filed rate doctrine" fulfills its purpose.

In this case, however, both rates were filed, but there is no need for concern that a shipper, unaware of the negotiations be-

tween Diamond and Rebel, could unwittingly be charged a higher rate than Diamond. Rather, the concern is that *any* shipper, examining tariffs ICC SMC 214-C and ICC REBL 332-B and their various cancellation and publication dates, would be confused as to which rate applies. Thus, a determination that the lower rate applies despite Item 110 does not conflict with the "filed rate doctrine" as provided for in sections 10761(a) and 10762.

Nevertheless, Rebel argues that the ICC's decision is based on a finding that Rebel mistakenly forgot to cancel all rates in tariff ICC SMC 214-C and intended that the lower rate in tariff ICC REBL 332-B would apply. Rebel further argues that the intention of the parties is irrelevant to the construction of a tariff, and a mistake in the publication of a tariff does not excuse deviation from the published rate. *Maislin*, 497 U.S. at ——, 110 S.Ct. at 2766; *National Van Lines, Inc. v. United States*, 355 F.2d 326, 332 (7th Cir.1966). Furthermore, the intentions of the parties are not relevant where the tariff is *unambiguous* on its face. *In re Carolina Motor Exp. Inc., Cooper v. Delaware Valley Shippers*, 949 F.2d 107, 111 n. 3 (4th Cir. 1991), *cert. granted*, —— U.S. ——, 112 S.Ct. 1934, 118 L.Ed.2d 541 (1992); *National Van Lines*, 355 F.2d at 331.

However, as previously stated, the ICC's decision is not based on the intentions of the parties nor any mistake Rebel may have made in publishing and cancelling its rates. Rather, the decision is based on the ICC's finding that a shipper examining both tariffs and their publication and cancellation dates would find them ambiguous and be unable to ascertain which applied.

The ICC is amply qualified to determine whether a publication practice would be confusing to shippers attempting to ascertain the applicable rate for a given shipment. When considering the ICC's experience, depth of knowledge, and Rebel's curious publication practices, such a determination appears reasonable and supported by substantial evidence. In addition, it is well settled that the lower rate applies where an ambiguity exists as to the applicable rate.

*Norfolk & Western Ry. v. Permaneer, Inc.*, 455 F.2d 76, 79 (8th Cir.1972); *Willingham v. Seligman*, 179 F.2d 257, 258 (5th Cir.1950); *see also Boone v. United States*, 109 F.2d 560, 562 (6th Cir.1940) (where more than one tariff is applicable, the lowest tariff applies). Thus, the ICC did not err in determining Rebel is not entitled to the alleged undercharges.

### III.

For the reasons stated, the judgment of the district court is AFFIRMED.

BAILEY BROWN, Senior Circuit Judge, concurring.

I believe that the decision of the district court affirming the decision of the Interstate Commerce Commission should be affirmed and therefore I concur in the result so affirming the district court.